UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KENNY PEELE,

                             Plaintiff,

                                        9:15-CV-0317

v.

                                        (GTS/TWD)

ROBERT DONAH, et al.,

                           Defendants.

_____

APPEARANCES:                           OF COUNSEL:

KENNEY PEELE
Plaintiff pro se
07-B-3122
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13021

HON. ERIC T. SCHNEIDERMAN         TIMOTHY P. MULVEY, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants                  615 Erie Boulevard West
The Capitol                             Suite 102
Albany, New York 12224            Syracuse, New York 13204-2455


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>ORDER AND REPORT-RECOMMENDATION</u>

     Plaintiff Kenney Peele commenced this pro se civil rights action under 42 U.S.C.

§ 1983 alleging: (1) Eighth Amendment excessive force claims against Defendant Corrections

Officers Robert Donah ("Donah"), Curtis E. Smith ("Smith"), Paul L. Fletcher ("Fletcher"), K.

Gordon ("Gordon"), and Chad Rodier ("Rodier"); (2) Eighth Amendment failure to intervene

against Defendant Sergeant Vincent Samolis ("Samolis"); and (3) failure to adequately train and

supervise his staff against Defendant Samolis. (*See* Dkt. Nos. 1 and 4.) The incident out of

which the claims arise is alleged to have taken place while Plaintiff was confined at the Clinton

Correctional Facility ("Clinton"). Defendants Fletcher, Gordon, Rodier, and Samolis seek

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure based upon

Plaintiff's alleged failure to exhaust his administrative remedies prior to commencing the action

and lack of personal involvement by the moving Defendants.[1] (Dkt. Nos. 35, 35-6 at 1.[2])

Plaintiff has opposed the motion. (Dkt. No. 39.) For the reasons that follow, the Court

recommends that Defendants Fletcher's motion for summary judgment be granted; and that the

motion for summary judgment be denied as to the other moving Defendants.

## I.    FACTUAL BACKGROUND

### A.    Plaintiff's Complaint[3]

On June 28, 2012, Plaintiff, having forgotten his shower shoes, got into the shower with

his socks on to prevent foot fungus. (Dkt. No. 1 at 6.[4]) While Plaintiff was in the shower,

Defendant Donah told him to remove his socks. *Id.* Plaintiff asked that he be allowed to rinse

---

[1] Defendants Donah and Smith have not moved for summary judgment.

[2] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

[3] A complaint, which like Plaintiff's is verified (Dkt. No. 1 at 13), is to be treated as an affidavit. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

[4] Inasmuch as the paragraphs in Plaintiff's Complaint are not numbered consecutively throughout the pleading, references herein are made to the page numbers rather than paragraph numbers.

the soap off and was told by Donah to go to the officers station when he was finished.  *Id.*

Donah asked Plaintiff how, after being incarcerated for five years, he could be unaware that

socks were not allowed in the shower.  *Id.* at 6-7.

According to Plaintiff, he was not allowed to get in line with the other inmates to return

to his cell block.  *Id.* at 7.  Instead, he was told by Donah to go downstairs to an isolated area in

the bathhouse stairwell where there were no cameras.  *Id.*  Defendant Smith looked down at

Plaintiff and Donah from the top of the landing.  *Id.*  Plaintiff claims that Donah then punched

him in the face with a closed fist, and when Plaintiff asked Donah why he had punched him,

Donah responded "Didn't I tell you to take them socks off boy?  Next time I tell you something

you do it, not when you want to."  *Id.*  Donah continued to punch Plaintiff in the face and body,

and Smith came downstairs and held Plaintiff while Donah continued to hit him.  *Id.* at 8.  Smith

began striking and kneeing Plaintiff until Donah and Smith were able to get him to the ground.

*Id.*  Donah and Smith applied mechanical restraints to Plaintiff's arms while he was on the

ground.  *Id.*

Plaintiff saw Defendants Gordon, Rodier, Fletcher, and Samolis, whom he referred to as

the response unit, inside the isolated area of the bathhouse stairwell.  *Id.* at 8.  Donah and Smith

grabbed Plaintiff assisting him to his feet.  *Id.*  Plaintiff overheard Samolis tell Donah, Smith,

Gordon, Rodier, and Fletcher not to hit Plaintiff in the face.  *Id.*  Gordon, Samolis, and Rodier

then dragged Plaintiff from the stairwell to medical.  *Id.*  While Plaintiff was being dragged from

the bathhouse area, a nightstick was placed under his chin and pressure was applied choking him.

*Id.* at 9.  After Plaintiff attempted to scream because he could not breathe, the nightstick was

removed from his neck and placed into the cord of his hooded sweater by one of the mentioned

officers, and the string was twisted until Plaintiff began to choke and gasp for air. *Id*. Plaintiff heard a voice in the background say "hang that nigger," and blacked out. *Id.*

When Plaintiff awoke, an unknown officer was placing scented toilet Lysol under his nose, and Rodier told Plaintiff he was removing the restraints and if Plaintiff tried anything he would kill him. *Id*. Samolis was present the entire time from the bathhouse to medical. *Id*.

**B.     Reports Regarding the Incident**

A Use of Force Report prepared by Defendant Samolis in connection with the June 28, 2012, incident states that while Plaintiff was being escorted from the bathhouse to lower F block by Donah for not complying with bathhouse rules and regulations, Plaintiff began to violently, with closed fists, strike Donah in the face and head as he was opening the door at the bottom of the stairway. (Dkt. No. 35-3 at 1.) According to the Report, Donah was knocked to the floor striking the back of his head, and Plaintiff was standing over him striking Donah with closed fists. *Id*. Smith grabbed Plaintiff forcing him off of Donah, and Plaintiff began striking Smith on his upper body with closed fists. Smith struck Plaintiff in the lower body with his knee several times. *Id*. The force used by Donah as described in the Report included striking Plaintiff numerous times in the head and upper body area with closed fists. *Id*. Plaintiff began to struggle violently until subdued by Donah and Smith, who applied mechanical restraints and assisted Plaintiff to his feet. *Id.* The Report described Plaintiff's injuries as a superficial abrasions on his left neck, right shoulder, and left thumb. *Id*. at 2, 4.

Unsworn statements by Defendants Gordon and Rodier indicate that both responded to the bathhouse stairwell incident and escorted Plaintiff from the stairwell to the hospital. *Id*. Gordon removed the mechanical restraints for the medical staff and Rodier frisked Plaintiff and

provided him with underwear. *Id.* Both escorted Plaintiff to Unit 14 after he was seen by medical. *Id.* Gordon and Rodier stated in their reports that the escorts were done without incident and under the supervision of Defendant Samolis. *Id.* Movants Fletcher, Gordon, Rodier, and Samolis have not submitted affidavits or any other sworn statements in support of their motion.

### C.    Misbehavior Reports

Misbehavior Reports charging 110.11 assault on staff, 104.11 violent conduct, 106.10 refusing direct order, and 104.13 creating a disturbance were filed against Plaintiff by Donah and Smith in connection with the June 28, 2012, incident. (Dkt. No. 1 at 24-25.) Both Donah and Smith claimed to have been assaulted by Plaintiff. *Id.*

Plaintiff was found guilty of all of the charges following a hearing held in July 2012. *Id.* at 26. The penalty imposed by the hearing officer was eighteen months in the Special Housing Unit ("SHU"), eighteen months loss of phone and commissary, and six months loss of good time. *Id.* Plaintiff appealed the hearing officer's decision and was granted a reversal and rehearing on October 2, 2012. *Id.* at 9. At the rehearing, Plaintiff was again found guilty of all charges. *Id.* at 10. Plaintiff appealed the disposition at the rehearing and was granted a reversal and expungement on January 16, 2013. *Id.* at 20, 29.

### D.    Plaintiff's Grievances

Plaintiff submitted grievances dated July 4, 2012, and July 9, 2012, arising out of the June 28, 2012, incident. (Dkt. No. 35-5 at 5, 8.) The grievances were consolidated under the number CL-62507-12. *Id.* The July 4, 2012, grievance described only the alleged assault by Donah and Smith. *Id.* at 5. The July 9, 2012, grievance stated that after he was cuffed, Donah

pulled the emergency pen and "other officers came & continue (sic) to choke, stomp, kick & punch me." *Id*. at 8. In his August 1, 2012, appeal on grievance number CL-62507-12, Plaintiff again stated that following the assault by Donah and Smith, after the emergency pen was pulled, he was beaten by their "fellow co-workers." *Id*. at 10.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT MOTIONS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining

6

the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, . . . nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999)[5] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

---

[5] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

III.    ANALYSIS

    A.    **Exhaustion of Administrative Remedies as to Movants**

        1.    <u>General Exhaustion Requirements Under the Prison Litigation Reform Act and the Department of Corrections and Community Supervision ("DOCCS") Inmate Grievance Procedure ("IGP")</u>

"The Prison Litigation Reform Act of 1995 (PLRA), mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions. 42 U.S.C. § 1997e(a)." *Ross v. Blake*, ___ U.S. ___, 2016 WL 3128839, at *3 (June 6, 2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). In New York state prisons, the Department of Corrections and Community Supervision ("DOCCS") has a well-established three-step internal grievance procedure ("IGP"). N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 7, § 701.5 (2013).

Generally speaking, the DOCCS IGP involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at 701.5(b)(1). If there is no such informal

resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*Id*. at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id*. at § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id*. at 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id*. at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. *Id*. at 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id*. at 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id*. at 701.5(d)(3)(ii).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford*, 548 U.S. at 93. Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies. *See Jones*, 549 U.S. at 216 ("We conclude that failure to exhaust is an affirmative defense under the PLRA"); *Bailey v. Fortier,* No. 09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *6, 2012 U.S. Dist. LEXIS 185178, at *14-15 (N.D.N.Y. Oct. 4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

### 2. Defendants' Failure to Exhaust Claim

Defendants Fletcher, Gordon, Rodier, and Samolis do not claim that Plaintiff failed to complete the three-steps in the IGP with regard consolidated grievance number CL-62507-12. (Dkt. No. 35-6 at 4.)  Rather, the basis for their motion for summary judgment for failure to exhaust is that Plaintiff's consolidated grievances identified only Defendants Donah and Smith and made no mention of Fletcher, Gordon, Rodier, and Samolis.  *Id*. at 4.  According to the moving Defendants "[a]bsent any mention of allegations of excessive force or failure to intervene violations by defendants Fletcher, Gordon, Rodier, and Samolis in his facility grievance, plaintiff has failed to exhaust his administrative remedies as to the Eighth Amendment claims he makes regarding the events of June 28, 2012 at Clinton CF."  *Id*. at 6.

### 3. Scope of Proper Exhaustion Under the DOCCS IGP

In *Jones*, 549 U.S. at 218-19, the Supreme Court found that the PLRA does not impose a requirement that an individual later named in a lawsuit have been named in a grievance in order to properly exhaust administrative remedies.  In *Jones*, the scope of proper exhaustion under the PLRA was found to be determined by reference to the state grievance system's procedural rules. *Id*. at 218.  In *Espinal v. Goord*, 558 F.3d 119, 126 (2d Cir. 2009), the Second Circuit, finding that the New York IGP regulations do not state that a prisoner's grievance must name the responsible party, concluded that "a New York state prisoner is not required to name responsible parties in a grievance in order to exhaust administrative remedies." (citing NYCRR, tit. 7, § 701.7(a)(1)(i) as offering the general guidance that a grievance should "contain a concise, specific description of the problem.").

The Court noted in *Espinal* that "[i]t is plausible that an identification requirement is

absent from the regulations because there are cases when an inmate is unable to name the responsible parties." *Id*. at 126. Although a grievant is not required to identify the parties against whom he is grieving, he is required to "provide a specific description of the problem." *Espinal*, 558 F.3d at 127 (citing NYCRR § 701.7(a)(1)(i)). *See Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004) (finding the PLRA exhaustion requirement to be "not dissimilar to the rules of notice pleading" and holding that because the PLRA's exhaustion requirement requires that prison officials be afforded the time and opportunity to address a complaint internally, "[i]n order to exhaust . . . inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures."); *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006) ("As in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming.") (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)).

"[T]he question for the Court is 'whether [the] plaintiff's grievance sufficiently alerted the prison officials that he was alleging some wrongdoing beyond' that alleged against the individual or individuals specifically named in the grievance." *Hilbert v. Fischer*, No. 12 Civ. 3843, 2013 WL 4774731, at *4 (S.D.N.Y. Sept. 5, 2013) (quoting *Percinthe v. Julien*, No. 08 Civ. 893, 2009 WL 2223070, at *4 (S.D.N.Y. July 24, 2009)).

#### 4. Analysis of the Adequacy of Plaintiff's Grievances

Defendants Fletcher, Gordon, Rodier, and Samolis were not identified by name in Plaintiff's grievances involving the June 28, 2012, alleged use of excessive force. (Dkt. No. 35-5 at 5-8, 10.) In his Affidavit in Opposition to Defendants' Statement of Material Facts, Plaintiff

has averred that "he did not name [Fletcher, Gordon, Rodier, and Samolis] in his grievance because he did not know their name." (Dkt. No. 39 at ¶ 11.) Plaintiff did, however, in his July 9, 2012, grievance state that "C.O. R Donah pulled the emergency pen after I was cuffed and other officers came & continue (sic) to choke, stomp, kick & punch me." (Dkt. No. 35-5 at 8.) In his Reply Affirmation, counsel for Defendants construes the foregoing as a "general allegation" by Plaintiff that "after officer Donah called for assistance, 'other officers' were at least present while the assault continued." (Dkt. No. 40 at 2.) Even if Plaintiff's statement could arguably be construed in that manner, Plaintiff clarified that he was referring to officers other than Donah and Smith in his grievance in his appeal from the Superintendent's decision, in which he stated that he was beaten by "officer fellow co-workers" of Donah and Smith after the pen was pulled. (Dkt. No. 35-5 at 10.)

Records of the DOCCS investigation conducted in connection with the June 28, 2012, use of force incident reveal that Fletcher, Gordon, Rodier, and Samolis were known by DOCCS to have been the individuals who responded to the incident in the bathhouse. (Dkt. Nos. 1 at 22-23; 35-3 at 14.) Defendants Gordon and Rodier provided statements dated June 28, 2012, indicating that they had responded to the bathhouse incident and were involved in escorting Plaintiff to the facility hospital. (Dkt. No. 1 at 22-23.) Defendant Samolis submitted a signed memorandum to the Captain's Office on June 28, 2012, stating that he had responded to the bathhouse incident and supervised the escort of Plaintiff to the facility hospital. (Dkt. No. 35-3 at 14.) Samolis identified the corrections officers involved in the escort as Gordon and Rodier, and Fletcher, who was present to operate the video camera at Samolis's request. *Id*.

In *Espinal*, 558 F.3d at 127, the Second Circuit found that the allegations in plaintiff's

grievance that he was beaten by two named security officers and "countless other security officers," and the specific date, time, and location of the incident provided enough information to "alert the prison to the nature of the wrong for which redress was sought." (citation and internal quotation marks and bracket omitted). The Court found in *Espinal* that the sufficiency of the grievance was apparent from the prison officials' initiation of an investigation of the complaint, which involved interviews with "all officers involved." *Id*. The Second Circuit explained that the grievance was sufficient to "advance the benefits of exhaustion" because "prison officials had the necessary information to investigate the complaints and the opportunity to learn which officers were involved in the alleged incident." *Id*.

In this case, Plaintiff's July 9, 2012, grievance placed prison officials on notice of his claim that he had been beaten by the officers who responded to Donah's pulling the emergency pen. (Dkt. No. 35-5 at 8.) The documentation of the investigation done of the incident shows that prison officials were not only aware of the identity of those individuals before Plaintiff filed his July 9, 2012, grievance, but that they had obtained statements from three of the four Defendants regarding the response and the escort of Plaintiff to the facility hospital. (Dkt. Nos. 1 at 22-23; 35-3 at 14.) In addition, the documentation of the investigation of the incident shows that prison officials were aware that Samolis had supervised the activities of Fletcher, Gordon, and Rodier in connection with their response to the situation with Donah and Smith and the escort of Plaintiff to the facility hospital. (Dkt. No. 35-3 at 14.)

Based upon the foregoing, the Court finds that Defendants Gordon and Rodier have failed in their burden of showing that Plaintiff failed to exhaust his administrative remedies with respect to his Eighth Amendment claim against them for excessive force. The Court further finds

that Defendant Samolis has failed in his burden of showing that Plaintiff failed to exhaust with regard to his Eighth Amendment claim for failure to intervene and adequately train and supervise his staff. Therefore, the Court recommends that Defendants Gordon, Rodier, and Samolis's motion for summary judgment on failure to exhaust administrative remedies grounds be denied.

Defendant Fletcher was not mentioned in Plaintiff's grievances, and the only mention of Defendant Fletcher in the investigation materials is Samolis's statement that Fletcher operated the video camera Samolis had requested for Plaintiff's escort to the facility hospital. (Dkt. No. 35-3 at 14.) Thus, there is no evidence in the summary judgment record suggesting that prison officials had any information about possible wrongful conduct by Fletcher to allow them to take appropriate responsive measures. *See Johnson*, 380 F.3d 691. Therefore, the Court finds that Defendant Fletcher has satisfied his burden of showing a failure to exhaust as to the excessive force claim asserted against him and recommends that summary judgment be granted to Fletcher.

### B.     Personal Involvement

The moving Defendants alternatively seek summary judgment on the grounds that Plaintiff cannot establish personal involvement on their part in the alleged violation of his Eighth Amendment rights. (Dkt. No. 35-6 at 7-8.) A personal involvement inquiry on summary judgment "examines only whether there is record evidence to support a factfinder's conclusion that the individual under consideration was involved in the alleged conduct." *Brandon v. Schroyer*, No. 9:13-CV-0939 (TJM/DEP), 2016 WL 1638242, at *14 (N.D.N.Y. Feb. 26, 2016). The Court finds that the investigative material annexed to Plaintiff's Complaint and that submitted by Defendants in support of their summary judgment motion discussed above, along with the allegations in Plaintiff's verified Complaint regarding the use of excessive force by

Gordon and Rodier and failure to intervene and adequately supervise by Samolis, raise material issues of fact on the issue of Gordon, Rodier, and Samolis's personal involvement which preclude the grant of summary judgment on lack of personal involvement grounds. (Dkt. Nos. 1 at 8-9, 11-12, 22-23; 35-3 at 14.) Therefore, the Court recommends that Defendants Gordon, Rodier, and Samolis's motion for summary judgment on lack of personal involvement grounds be denied.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 35) be **GRANTED IN PART AND DENIED IN PART** as follows:

(1) summary judgment be **GRANTED** in Defendant Fletcher's favor on the ground that Plaintiff failed to exhaust his administrative remedies; and

(2) summary judgment be **DENIED** as to Defendants Gordon, Rodier, and Samolis; and it hereby

**ORDERED**, that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: June 14, 2016
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2012 WL 6935254
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Everton BAILEY, Plaintiff,
v.
M. FORTIER, Defendant.

Civ. Action No. 9:09–CV–0742 (GLS/DEP).
|
Oct. 4, 2012.

**Attorneys and Law Firms**

Hancock Estabrook LLP, Michael J. Sciotti, Esq., Robert Thorpe, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney, Charles E. Roberts, Esq., Assistant U.S. Attorney, of counsel, Syracuse, NY, for Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Everton Bailey, a federal prison inmate, has commenced this *Bivens* [1] action against defendant Michelle Fortier, a corrections officer stationed at the prison facility in which Bailey was confined at the relevant times, alleging deprivation of his civil rights. Bailey's claims are based upon Fortier's alleged failure to protect him from an assault by a cellmate, despite having registered prior complaints expressing fear for his safety.

Currently at the forefront of the action is the threshold question of whether Bailey, who admits that he did not file a grievance following the procedures in place at Bureau of Prisons ("BOP") facilities, should be excused from the requirement of exhausting administrative remedies before commencing suit due to the alleged refusal of prison officials to provide him with the forms necessary to file a grievance. Because I find, based upon an evidentiary hearing conducted, that Bailey was not prevented by the actions of prison officials from filing a grievance regarding his claim against Fortier, and that he has offered no special circumstances providing a basis to excuse his failure to exhaust administrative

remedies, I recommend that his complaint be dismissed on this procedural basis, without addressing its merits.

I. *BACKGROUND*

Bailey is a federal prison inmate currently being held in the custody of the BOP as a result of a 2007 criminal conviction entered in the United States District Court for the Eastern District of Pennsylvania. *See generally* Complaint (Dkt. No. 1); *see also* VanWeelden Decl. (Dkt. No. 10–4) ¶ 5; June 20, 2012 Hearing Transcript (Dkt. No. 44) at p. 84. [2] While he is presently housed in another BOP facility, at times relevant to this litigation Bailey was designated by the BOP to the Ray Brook Federal Correctional Institution ("FCI Ray Brook"), located in Ray Brook, New York. *Id.*

On the morning of February 23, 2009, while housed in a six-person cell in the Mohawk Housing Unit at FCI Ray Brook, Bailey was confronted and physically assaulted by one of his cellmates after being accused of stealing that inmate's prayer oil. Complaint (Dkt. No. 1) ¶¶ 8–9; *see also* VanWeelden Decl. (Dkt. No. 10–4) Exh. D. Bailey reported the incident to Fortier, and requested that he be moved to another cell. Complaint (Dkt. No. 1) ¶ 10. That request was denied, and Bailey was directed by Fortier to return to his cell in light of an impending inmate count. *Id.* at ¶ 11.

Following the inmate count, Bailey again was accosted by the same inmate, who on this occasion threw hot oil from a ceramic mug onto his face. [3] Complaint (Dkt. No. 1) ¶ 13; VanWeelden Decl. (Dkt. No. 10–4) Exh. D; Tr. 100, 145. Bailey suffered second degree burns to his face resulting in his being hospitalized at an outside medical facility for a period of fourteen days. Complaint (Dkt. No. 1) ¶¶ 13–14; Tr. 32, 84–85. Upon his return to FCI Ray Brook, Bailey was placed in a special housing unit ("SHU") cell, where he remained until he was transferred to another BOP facility. Tr. 59–60, 85.

**\*2** The BOP has established an Administrative Remedy Program ("ARP"), comprised of a four-step administrative process through which inmates can seek formal internal review of any complaint regarding any aspect of their imprisonment. Tr. 10; 28 C.F.R. § 542.10 *et seq.; see also Macias v. Zenk,* 495 F.3d 37, 42 (2d Cir.2007). In accordance with the established ARP protocol, an inmate must first attempt informal resolution of his or her complaint by presenting the issue informally to staff, and staff must attempt to resolve the issue. 28 C.F.R. § 542.13(a); *see also Johnson v. Testman,* 380 F.3d 691, **693** (2d Cir.2004). This

informal, initial procedure typically begins with the filing of a "cop-out," which can be submitted either on a BP–8 form available to inmates through several sources, including their assigned counselors, or on paper of any other description. Tr. 10, 22, 27, 66–67, 129, 142.

If the complaint cannot be resolved informally, the inmate may next submit a formal written Administrative Remedy Request ("ARR") to the warden of the facility, utilizing a BP–9 form, within twenty calendar days of the event that generated the inmate's complaint.[4] Tr. 22, 32, 44; 28 C.F.R. § 542.14(a); *see also Johnson,* 380 F.3d at **693**. That twenty-day period, however, can be extended in appropriate circumstances.[5] Tr. 33, 54, 144. If that formal request is denied, the inmate may next appeal the matter to the appropriate BOP Regional Director, utilizing a BP–10 form, within twenty calendar days of the date the grievance is denied by the facility warden. Tr. 22; 28 C.F.R. § 542.15(a); *see also Johnson,* 380 F.3d at **693**. An unfavorable decision from the Regional Director can then be appealed to the General Counsel's office, utilizing a BP–11 form, within twenty calendar days of the date of the Regional Director's response. Tr. 22; 28 C.F.R. § 542.15(a).

Despite the existence of the ARP, Bailey did not avail himself of that process by filing a grievance regarding the assault or the defendant's alleged failure to protect him from it. Tr. 101–02, 106. Bailey claims that he requested the appropriate forms for commencing the grievance process from several prison workers, including Hawley Snyder, Barbara Darrah, and the warden at FCI Ray Brook. Tr. 86–88, 91, 93–95, 107–09. Employees at FCI Ray Brook, however, uniformly testified that Bailey never requested the appropriate grievance forms from them. *See* Tr. 72, 131, 146–47, 153, 155, 168; *see also* Tr. 49 (Robin Van Weelden); 161 (Jean Marie Diehl); 166 (Michelle Gonyea). I credit the testimony of defendant's witnesses and find that Bailey failed to ask his corrections counselor, or any other BOP employee at FCI Ray Brook, for the necessary forms to commence the grievance process.

The record also reflects that Bailey had abundant opportunity to secure the necessary grievance forms. In February and March of 2009, he was assigned a unit team that included Barbara Darrah, his unit manager; Michelle Gonyea, a case worker; Hawley Snyder, his assigned corrections counselor; and one other corrections counselor.[6] Tr. 46, 86, 140–41. Members of Bailey's unit team, particularly his corrections counselor, were in frequent contact with him. *See, e.g.,* Tr. 126, 129–30, 140–41, 165.

**\*3** Various other BOP officials were also in regular contact with Bailey, making periodic rounds of the FCI Ray Brook SHU. Tr. 35. For example, at the times relevant to this litigation, the facility's warden typically visited the SHU every Wednesday morning, normally accompanied by Robin Van Weelden, who in February 2009 served as a legal assistant, as well as one or two associate wardens, a corrections captain, and unit team members. Tr. 35, 55. When making those rounds the group would proceed from cell to cell, knocking on doors and asking whether an inmate in a particular cell wished to voice any needs. Tr. 57. In addition, Barbara Darrah, as a unit manager, was required to visit inmates in the SHU twice weekly, although she testified that she was in that portion of the facility "pretty much daily." Tr. 126. When visiting the SHU, Darrah generally carried with her a folder of various forms, including BP–8, BP–9, BP–10, BP–11 and cop-out forms, earning her the nickname "the form lady." Tr. 70–71, 120, 124–27, 131. Like the warden and the warden's group, when visiting the SHU facility Darrah normally would proceed from cell-to-cell. Tr. 128. Similarly Michelle Gonyea, as plaintiff's case manager during February and March of 2009, was required to visit the SHU at least once weekly. Tr. 165.

Despite all of those visits and requests as to whether he needed anything, Bailey did not ask any of those individuals for the forms necessary to grieve Fortier's alleged failure to protect him from harm. Tr. 161–62, 166, 49–50, 72, 132, 144, 154–55, 161, 166.

As previously indicated, plaintiff was absent from FCI Ray Brook receiving outside treatment for his injuries during the fourteen-day period immediately following the inmate assault. In accordance with FCI Ray Brook policy requiring visits by prison officials to any inmate hospitalized for more than five days, Darrah, as plaintiff's unit manager, visited him in or about March of 2009, while he was a patient at the Adirondack Medical Center in Saranac Lake, in order to insure that his needs were being met. Tr. 133. When asked on that occasion whether he needed anything, Bailey replied, "No."[7] *Id.*

## II. *PROCEDURAL HISTORY*

Bailey commenced this action on June 29, 2009. Dkt. No. 1. His complaint identifies Corrections Officer M. Fortier as the sole named defendant, and alleges that she violated his

constitutional rights by failing to protect him from foreseeable harm. *Id.*

On January 8, 2010, prior to answering, Fortier moved to dismiss Bailey's complaint for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, alternatively, for summary judgment pursuant to Rule 56. Dkt. No. 10. The sole basis for Fortier's motion was her contention that Bailey's complaint is subject to dismissal based upon his failure to exhaust available administrative remedies before commencing suit, as required under 42 U.S.C. § 1997e(a). That motion resulted in my issuance of a report on August 30, 2010, recommending that the motion be denied, based upon the existence of genuine disputes of material fact to be resolved before addressing whether a proper basis for excusing the governing exhaustion requirement had been demonstrated. Dkt. No. 19. That recommendation was adopted by Chief District Judge Gary L. Sharpe on October 12, 2010. Dkt. No. 21.

**\*4** Following the issuance and acceptance of my report and recommendation, the parties were afforded the opportunity to engage in discovery, and a scheduling order was entered requiring, *inter alia,* that any additional dispositive motions be filed on or before October 3, 2011. *See* Dkt. No. 23. All deadlines under that scheduling order have passed, without the filing of any additional motions, and the case is now trial-ready. In light of the existence of a threshold procedural issue regarding exhaustion, the matter was referred to me for the purpose of conducting an evidentiary hearing, pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011), in order to develop the record concerning Bailey's efforts to satisfy his exhaustion requirement. *See* Text Entry 11/02/11. That hearing was conducted on June 20, **2012**, *see* Text Entry 6/20/12, and, following the close of the hearing, decision was reserved pending briefing by the parties.[8],[9]

## III. *DISCUSSION*

### A. *Governing Legal Principles*
The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 **WL** 389003, at \*5–6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002). An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 **WL** 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387– 88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias,* 495 F.3d at 43 (citing *Woodford* ). Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken. *Macias,* 495 F.3d at 44; *see also Johnson v. Rowley,* 569 F.3d 40, 45 (2d Cir.2009); *Strong v. Lapin,* No. 90–CV–3522, 2010 **WL** 276206, at \*4 (E.D.N.Y. Jan.15, 2010) ("Until the BOP'S Central Office considers the appeal, no administrative remedy is considered to be fully exhausted.").

**\*5** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted in the event of a failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed rubric, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendant should be deemed to have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through the defendant's own actions preventing the plaintiff from exhausting otherwise available remedies, he or she should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the proffered defense survives these first two levels of scrutiny, the court must determine whether the plaintiff has established the existence of special

circumstances sufficient "to justify the failure to comply with applicable administrative procedural requirements. [10], [11] *Id.*

### B. *Burden of Proof*

Before applying the foregoing legal principles, I must first consider who bears the burden of proof, and whether that burden shifts throughout the analysis prescribed under *Hemphill.*

As an affirmative defense, *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), exhaustion is a claim upon which the party asserting it typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence. *Soria v. Girdich,* No. 9:04–CV–727, 2007 WL 4790807, at *2 (N.D.N.Y. Dec. 2007) (DiBianco, M.J.) (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 247 (S.D.N.Y.2003)); *McEachin v. Selsky,* No. 9:04–CV–83(FJS/RFT), 2005 WL 2128851, at *4 (N.D.N.Y. Aug.30, 2005) (Scullin, C.J.) (citing *Howard v. Goord,* No. 98–CV–7471, 1999 WL 1288679, *3 (E.D.N.Y. Dec. 28, 1999)), *aff'd in part, vacated in part,* 225 F. App'x 36 (2d Cir.2007). The issue is somewhat complicated, however, by consideration of the three-part analysis mandated by *Hemphill* and related cases because that line of cases incorporates concepts—such as estoppel, for example—that typically require the party asserting them to bear the ultimate burden of proof. *See e.g., Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir.2007) ("The plaintiff bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel ...."); *In re Heflin,* 464 B.R. 545, 554 (D.Conn.2011) ("The burden of providing every element of an estoppel is upon the party seeking to set up the estoppel.") (citing *Comm'r v. Union Pac. R.R. Co.,* 86 F.2d 637, 640 (2d Cir.1936)).

\*6 Also complicating matters is the fact that several courts have held that once a defendant satisfies the burden of demonstrating that an inmate has failed to exhaust administrative remedies, it then becomes incumbent upon the plaintiff to counter with a showing of unavailability, estoppel, or special circumstances. *See, e.g., Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *4 and n. 17 (N.D.N.Y. Mar.31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw,* No. 9:09–CV–1354, 2011 WL 4345299, at *5 and n. 5 (N.D.N.Y. Aug.10, 2011) (Lowe, M.J.) (citing cases); *report and recommendation adopted,* 2011 WL 4345296 (N.D.N.Y. Sep.15, 2011) (McAvoy, S.J.); *Cohn v. KeySpan Corp.,* 713 F.Supp.2d 143, 155 (E.D.N.Y.2010) (finding

that, in the employment discrimination context, defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense.). Those decisions, while referencing the burden of proof on an affirmative defense, seem to primarily address an inmate's burden of *production,* or of going forward, to show facts that would form the basis for finding of unavailability, estoppel, or a finding of special circumstances, rather than speaking to the ultimate burden of *persuasion.*

I have been unable to uncover any cases squarely holding that the defendant bears the ultimate burden of proof with regard to all elements of a *Hemphill* analysis. In the final analysis, however, *Hemphill* addresses all of the elements a court is required to consider when analyzing an exhaustion defense. *See Macias,* 495 F.3d at 41 ("In *Hemphill* we "read together" [a series of cases] and formulated a three-part *test* ....") (emphasis added). Therefore, I recommend a finding that, while the burden of production may shift to the plaintiff when a court undertakes a *Hemphill* analysis, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant. *See Soria,* 2007 WL 4790807, at *2 ("[A]s with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies.").

### C. *Application of Governing Legal Principles*

### 1. *Availability of Administrative Remedy*

In this instance, the question of whether the ARP was available to Bailey is at the heart of the exhaustion analysis. The hearing testimony confirmed, and Bailey admitted, that at all times relevant to this litigation, there was an inmate grievance procedure in place at FCI Ray Brook. This, however, does not necessarily mean that it was "available" to the plaintiff.

Bailey contends that the grievance process was not available to him in light of the alleged refusal of prison officials to provide him with the forms necessary to file an ARR and pursue the grievance to culmination. Having considered the competing testimony, however, I conclude that Fortier has established, by a preponderance of the evidence, that the forms necessary to pursue a grievance in accordance with the ARP in place at FCI Ray Brook were available to Bailey through several sources, but were not requested. As such, Fortier has satisfied the first *Hemphill* factor.

## 2. *Presentation of Defense/Estoppel*

**\*7** The focus of the second prong of the *Hemphill* analysis is upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In her answer, Fortier raised exhaustion as a defense in a timely fashion. *See* Answer (Dkt. No. 22) Second Defense ("Plaintiff clearly failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)."). Bailey argues, however, that his failure to follow the prescribed grievance process was a direct result of the refusal of prison officials to cooperate in his efforts to grieve the matter.

" 'Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.' " *Atkins v. Menard,* No. 9:11–CV–9366, **2012 WL** 4026840, at \*3 (N.D.N.Y. Sept.12, **2012**) (Suddaby, J.) (citing *Murray,* 2010 **WL** 1235591, at \*5 and n. 26 (collecting cases)). Put differently, a plaintiff must allege that a defendant named in the lawsuit acted to interfere with his ability to exhaust in order to establish a basis to estop that defendant from invoking the exhaustion defense. *Calloway,* 2011 **WL** 4345299, at \*4 (citing *Bennett v. James,* 737 F.Supp.2d 219, 226 (S.D.N.Y.2010), *aff'd,* 441 F. App'x 816 (2d Cir.2011)) (other citations omitted).

The question of whether, in this instance, prison officials should be estopped from asserting failure to exhaust as an affirmative defense as a result of their conduct is inextricably intertwined with the question of availability of the remedy. Assuming, however, that this presents a distinct inquiry, the court must examine whether, through her conduct, Fortier has provided a basis to estop her from asserting an exhaustion defense.

In this instance, Bailey does not allege that Fortier engaged in a campaign to preclude him from filing a grievance regarding her actions. Instead, his focus is upon the alleged refusal of other officials at FCI Ray Brook to provide him with necessary forms and cooperate in his efforts to present his grievance against Fortier. Accordingly, Bailey has failed to present any evidence that would support an estoppel against the defendant from raising the issue of exhaustion. *Atkins,*

**2012 WL** 4026840, at \* 3. Therefore, I conclude that Fortier has proven, by a preponderance of the evidence, that she did not, through her own actions, preclude Bailey from taking advantage of the ARP and therefore should not be estopped from asserting the defense.

## 3. *Special Circumstances*

The third, catchall factor that must be considered under the Second Circuit's prescribed exhaustion rubric centers upon whether special circumstances sufficient to justify excusing the plaintiff's failure to exhaust administrative remedies have been demonstrated. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676–77; *Hargrove,* 2007 **WL** 389003, at \*10. Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 **WL** 389003, at \*10 (quoting and citing *Giano* ). Special circumstances may also exist when a facility's "[f]ailure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance process unavailable to him." *Murray,* 2010 **WL** 1235591, at \*6 (quoting *Sandlin v. Poole,* 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendant's are estopped from relying on exhaustion defense as 'special circumstances' excusing plaintiff's failure to exhaust")).

**\*8** During the evidentiary hearing, Bailey testified to his awareness of the existence of the ARP at FCI Ray Brook. *See, e.g.,* Tr. 102. Bailey's testimony regarding his alleged efforts to secure the forms necessary to pursue the grievance plainly evidences his knowledge of the requirement that he exhaust available administrative remedies, and negates a finding of any reasonable belief on his part that the dispute in issue was not grievable and could not have been presented through the BOP's internal grievance process. Accordingly, again allocating the ultimate burden of proof on the issue of special circumstances to the defendant, I nonetheless conclude that she has demonstrated, by a preponderance of the evidence, the absence of any special circumstances that would serve to excuse plaintiff's failure to exhaust administrative remedies.

## IV. *SUMMARY AND RECOMMENDATION*

The credible testimony and evidence adduced at the recent hearing, held to address the merits of defendant's exhaustion

defense, establishes that (1) Bailey failed to avail himself of the BOP grievance process, which was available to him, before commencing this action; (2) Fortier did not, through her actions, preclude Bailey from filing a grievance regarding the claims set forth in his complaint, or otherwise engage in conduct for which she should be estopped from asserting failure to exhaust as an affirmative defense; and (3) Bailey has offered no special circumstances warranting that he be excused from the PLRA's exhaustion requirement. Accordingly, it is therefore hereby respectfully

RECOMMENDED, that plaintiff's complaint in this action be DISMISSED, based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6935254

Footnotes

1   *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2   The June 20, **2012** Hearing Transcript (Dkt. No. 44) will hereinafter be cited as "Tr. ____".

3   According to Bailey, there were no corrections officers present in his cell unit at the time of the assault. Complaint (Dkt. No. 1) ¶ 13.

4   Plaintiff was aware of the twenty-day limitation for filing a BP–9 form to initiate the formal grievance process. Tr. 103.

5   Here, the record demonstrates that in light of his circumstances, including the fourteen-day period of hospitalization following the incident, Bailey almost certainly would have been granted relief from that requirement had such a request been made. *See* Tr. 43, 144. I note, parenthetically, that the handbook provided to inmates at FCI Ray Brook does not address the possibility of requesting an extension of the twenty-day time limit for filing a BP–9. *See* Tr. 34, 43.

6   Jean Marie Diehl took over as plaintiff's correction counselor in or about September 2009, shortly before Snyder's retirement from the BOP. Tr. 140, 163.

7   During the hearing Bailey testified that he did not recall Darrah visiting him. *See* Tr. 114. Once again, I credit the testimony of Darrah over that of the Bailey with respect to this issue.

8   The hearing was conducted by video conference, with Bailey participating and testifying from the Kentucky federal correctional facility in which he is currently being held, pursuant to Rule 43(a) of the Federal Rules of Civil Procedure. *See Rivera v. Santirocco,* 814 F.2d 859, 862 (2d Cir.1987). At the outset of the hearing I placed upon the record the factors which I considered in declining to exercise my discretion to require that Bailey be produced in person for the evidentiary hearing. *See* Tr. 3.

9   Attorney Michael J. Sciotti, Esq., of the firm of Hancock & Estabrook, LLP, was appointed in January **2012** to represent the plaintiff in this action, *pro bono,* at the hearing. The court wishes to express its thanks to Attorney Sciotti and his co-counsel, Robert Thorpe, Esq., for their energetic and diligent efforts on behalf of the plaintiff.

10  In *Macias,* which, like this action, involved an Eighth Amendment claim under *Bivens,* as well as claims under the Federal Court Claims Act, 28 U.S.C. § 2671 *et seq.,* defendants asserted that plaintiff's complaint was subject to dismissal under the PLRA based upon his failure to exhaust available administrative remedies. *Macias,* 495 F.3d at 40. Reiterating the importance of exhaustion in both a substantive and a procedural sense, the Second Circuit concluded that, while a prisoner may have substantively exhausted remedies by making informal complaints regarding the conditions at issue, the PLRA, as illuminated by *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368, requires proper procedural exhaustion through the available grievance channels. *Id.* at 41. The court left open, however, the possibility that, notwithstanding the Supreme Court's decision in *Woodford,* a defendant could be precluded from asserting failure to exhaust available administrative remedies in the event of a finding that threats by prison officials may have deterred compliance with the PLRA exhaustion requirements, including under *Hemphill. Id.* at 44–45. The court in *Macias* also noted that the plaintiff in that case did not assert that the available internal remedial scheme was so confusing as to excuse his failure to avail himself of that process, thereby obviating the need for the court to determine what effect, if any, *Woodford* would

have upon the *Hemphill* holding to the effect that a reasonable misinterpretation of the available scheme could justify an inmate's failure to follow the procedural rules. *See Amador v. Superintendents of Dep't of Correctional Serv.,* No. 03 CIV. 0650 (KTD/CWG), 2007 **WL** 4326747, at *6 (S.D.N.Y. Dec.4, 2007).* It therefore appears that the teachings of *Hemphill* remain intact, at least with regard to the first two points of inquiry. *Id.* at *7.

11  In practicality, these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 **WL** 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**End of Document**                                                             © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1638242
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Chamma K. Brandon, Plaintiff,

v.

Dr. Glen Schroyer, et al., Defendants.

Civil Action No. 9:13-CV-0939 (TJM/DEP)

|

Signed February 26, 2016

**Attorneys and Law Firms**

FOR PLAINTIFF: CHAMMA K. BRANDON, Pro se, 12-A-5715, Sing Sing Correctional Facility, 354 Hunter Street, Ossining, NY 10562.

FOR DEFENDANT SCHROYER: THUILLEZ, FORD, GOLD, BUTLER & MONROE, LLP, 20 Corporate Woods Blvd., 3rd Floor, OF COUNSEL: KELLY M. MONROE, ESQ., MOLLY C. CASEY, ESQ., Albany, NY 12211.

FOR REMAINING DEFENDANTS: LEMIRE, JOHNSON & HIGGINS, LLC, P.O. Box 2485, 2534 Route 9, OF COUNSEL: BRADLEY J. STEVENS, ESQ., Malta, NY 12020.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. MAGISTRATE JUDGE

**\*1** This is an action brought by *pro se* plaintiff Chamma K. Brandon, a prison inmate formerly confined in the Clinton County Jail ("CCJ"), pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, against several individuals working at the facility alleging that they deprived him of his civil rights during his period of incarceration there. Plaintiff's claims fall into three groups, complaining of (1) a one-month hiatus in a low-fat, low-cholesterol ("heart-healthy") diet; (2) the failure to honor his religious diet by serving him pork products; and (3) the failure to otherwise accommodate his religious beliefs as a Muslim. Plaintiff contends that, by their actions, defendants violated his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution, as well as the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc.

Now that discovery in the action is complete, all of the defendants, including Dr. Glen Schroyer, who is separately represented, have moved for the entry of summary judgment dismissing plaintiff's claims. For the reasons set forth below, I recommend that the motions be granted in part but otherwise denied.

I. *BACKGROUND*

Plaintiff was confined in the CCJ beginning on January 14, 2012, and again following his re-arrest on March 2, 2012, until December 28, 2012, when he was transferred into the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *Dkt. No. 17 at 3, 12–, 3.* Upon his entry into the CCJ for the first time in January 2012, Brandon was five-feet, eleven-inches in height, weighed 250 pounds, and was considered clinically obese. [1] *Dkt. No. 17 at 2; Dkt. No. 77–10 at 4.* Plaintiff alleges that, while he was incarcerated at the CCJ, the defendants (1) deprived him of constitutionally adequate medical care by removing him from a heart-healthy diet for one month; (2) deprived him of his rights under the First Amendment and RLUIPA to freely exercise his Muslim religion by (a) repeatedly providing him with meals that contained pork products, (b) denying him the opportunity to participate in Ramadan, and (c) denying him access to worship space and congregate religious services; and (3) retaliated against him by denying him adequate medical care and depriving him of his right to freely exercise his religion in response to grievances and complaints he filed against them during his incarceration at the CCJ. [2] *See generally Dkt. No. 17.* Additionally, plaintiff's amended complaint asserts a failure-to-protect claim against defendants Clancy and Blaise, a corrections sergeant and a corrections officer, respectively, at the CCJ. *Id.*

A. *Plaintiff's Diet*
**\*2** When he first arrived at the CCJ, Brandon reported that he was allergic to shellfish. *Dkt. No. 17 at 4; Dkt. No. 75–6 at 2.* A special diet notification form reflecting that food allergy was forwarded to the facility's kitchen. [3] *See Dkt. No. 17 at 47; Dkt. No. 75–1 at 37.* In March 2012, plaintiff reported that tomatoes and tomato by-products cause him to experience severe acid reflux. *Dkt. No. 17 at 4; Dkt. No. 75–6 at 2.* As a result, a notification was sent by medical personnel to the CCJ kitchen indicating "no tomato or tomato products per MD." *Dkt. No. 17 at 48; Dkt. No. 75–1 at 38.*

In May 2012, defendant Dr. Glen Schroyer, the jail physician at the CCJ, placed plaintiff on a heart-healthy diet due to his high cholesterol levels. *Dkt. No. 17 at 4–5,* 49; *Dkt. No. 75–1 at 39; Dkt. No. 75–6 at 2.* Plaintiff's heart-healthy diet restriction was later lifted on October 16, 2012, after a review of plaintiff's commissary purchases, which were being monitored by medical staff, revealed the purchase of many items that were inconsistent with plaintiff's dietary restrictions, including products that were high in fat and cholesterol.[4] *Dkt. No 17 at 8–9,* 52; *Dkt. No. 75–1 at 41; Dkt. No. 75–6 at 3.* For example, the record reveals that, during the relevant period, plaintiff's commissary purchases included a wide array of candy, cookies, snacks, and sugared drinks. *Dkt. No. 75–1 at 60–62.* Plaintiff also purchased Ramen chili, which contains tomato powder, and is therefore inconsistent with his previously alleged sensitivity to tomatoes and tomato by-products. *Id.*

Plaintiff's heart-healthy diet was restored on or about November 21, 2012, after plaintiff promised not to purchase certain designated items from the commissary. *Dkt. No 17 at 10,* 53, 188; *Dkt. No. 75–1 at 42.* Following that restoration, plaintiff's restrictive diet remained in place until his transfer out of the CCJ. *Dkt. No. 17 at 10.*

**\*3** In addition to raising concerns about health-related dietary restrictions implemented at the CCJ, as part of his religious accommodation claim, plaintiff alleges that defendants served him food that was inconsistent with his religion, as a Muslim. Plaintiff alleges that he informed prison officials at the CCJ upon his arrival on January 14, 2012, and again when he was rearrested on March 2, 2012, that, because of his Muslim religion, he cannot eat pork. *Dkt. No 17 at 12–13; Dkt. No. 83 at 6.* According to plaintiff, despite prison officials' awareness of this restriction, he was served food containing pork on numerous occasions. *Dkt. No. 17 at 17–18,* 20–22. Plaintiff alleges that between the time of his entry into the CCJ through May 28, 2012, he was routinely served pork against his religious beliefs. *Dkt. No 17 at 13,* 17. He further claims that on May 28, 2012, he filed a complaint with medical staff concerning the failure to receive a religious diet, and that in response, defendant Nurse Kinter stated that the kitchen was aware of his dietary restrictions.[5] *Id.* at 13.

On June 21, 2012, plaintiff submitted a sick-call request inquiring about a knee brace and complaining of being served pork. *Dkt. No. 17 at 13,* 66. The only response to that sick-call request was recorded as "given knee brace." *Id.* at 66. Plaintiff submitted an additional sick-call request raising concerns about his diet on July 4, 2012. *Id.* at 13, 67. In response, a nurse[6] wrote, "Done – for no fish/shell fish. Need to ask security staff to submit diet slip for *pork* medical does not do religious diets." *Id.* at 67 (emphasis in original).

Plaintiff cites eight additional instances when he was served pork and raised complaints. The first and second occurred on September 24, 2012, during lunch and dinner. *Dkt. No. 93–4 at 82–82.* The next two instances occurred on October 9 and 10, 2012. *Id.* at 94–99. On October 17, 2012, plaintiff contends he was served pork, after which he filed a grievance and was provided a new meal. *Dkt. No. 17 at 18; Dkt. No. 93–4 at 116–17.* Plaintiff was again allegedly served pork on October 29, 2012, although a grievance filed regarding that incident purportedly "disappeared." *Dkt. No. 17 at 20.* Plaintiff was also allegedly served a meal containing pork on November 5, 2012, and although he claims to have lodged a grievance concerning that matter it is not included within his submissions. *Dkt. No. 17 at 21.* The last occurrence of allegedly being served pork was on December 25, 2012, and plaintiff again filed a grievance concerning the matter. *Dkt. No. 17 at 22; Dkt. No. 93–4 at 16465.*

The record evidence raises a number of questions regarding when the CCJ kitchen staff learned of plaintiff's religious dietary restrictions. According to defendant Laurin, when plaintiff first arrived at the CCJ on January 14, 2012, he did not declare any religious affiliation. *Dkt. No. 7714 at 2.* Although plaintiff disputes this, *Dkt. No. 17 at 12; Dkt. No. 83 at 6,* his initial booking intake record does not reflect any religious designation.[7] *Dkt. No. 77–6 at 2.* There is no dispute, however, that when plaintiff was rebooked on March 2, 2012, he stated that he was a Muslim, and this was reflected on his booking sheet.[8] *Dkt. No. 17 at 210; Dkt. No. 83–3 at 36.*

**\*4** Defendant Laurin explained that "it is the practice of the CCJ that any religious diets to be issued to inmates are initiated by the Booking Officer after an inmate requests such accommodation and demonstrates that he has a sincerely held belief. Notifications of any religious diets have been forwarded to the kitchen." *Dkt. No. 77–14 at 2.* Defendant Laurin contends that, in light of plaintiff's declaration of his religion in March 2012, a notification was placed in his file indicating that he should be provided with a diet consistent with his religious beliefs. *Dkt. No. 77–14 at 3.* In support of that contention, defendant Laurin cites to a document in the record entitled "SPECIAL DIET NOTIFICATION," reflecting that plaintiff, as a Muslim, was not to receive pork

or pork products. *Dkt. No. 77–3 at 7.* Notably, the copy of that notice that is included by defendant Laurin in support of his motion is not dated. *Id.* As an attachment to his amended complaint and in response to defendants' motion, however, plaintiff has submitted copies of the same notice, except his copies both include a date of "10/5/12," which is written in what appears to be defendant Laurin's handwriting. *Dkt. No. 17 at 51; Dkt. No. 83–3 at 42.* Plaintiff contends, and the court finds it plausible, that the version of this notice produced by defendants in support of their motion has been "falsified ... by removing the date written on the notification[.]" [9] *Dkt. No. 93–3 at 11.*

In any event, a careful review of the chronology, including plaintiff's grievances and responses to those grievances by CCJ staff, buttresses the conclusion that it was not until at least late-September 2012 that the CCJ kitchen staff was notified of plaintiff's religious dietary restrictions. *See, e.g., Dkt. No. 77–5 at 21* (entry dated 9/27/12 authored by defendant Laurin stating, "[A]s of 9/27/12 the kitchen was reviewed [sic] of your diet ... and that you are Muslim"); *Dkt. No. 93–4 at 81* (entry dated 9/27/12 and authored by defendant Laurin stating that the "kitchen ... did not have that you were Muslim. You will get no pork or pork products"); *id.* at 94 (entry dated 10/10/12 and authored by Corrections Officer Couture stating, "I talked to Michelle in the kitchen and she told me that until recently they had nothing stating that Inmate Brandon was a no pork diet."); *id.* at 104 (entry dated 10/15/12 and authored by defendant Laurin stating, "Inmate Brandon was not marked in the kitchen as Muslim diet. That was corrected 10/5/12").

From the evidence in the record, two things are clear. First, until September 27, 2012, the CCJ kitchen staff was unaware of plaintiff's religious dietary restrictions, giving rise to the inference that, until that date, plaintiff was being served pork and pork products on occasion. Secondly, even after the kitchen learned of plaintiff's religious dietary restriction, plaintiff believes that he was served pork or pork products on six occasions, including (1) October 9, 2012; (2) October 10, 2012; (3) October 17, 2012; (4) October 29, 2012; (5) November 5, 2012; and (6) December 25, 2012. [10] *Dkt. No. 17 at 18,* 20, 21, 22; *Dkt. No. 93–4 at 9499,* 116–17, 164–65.

**B.** *Other Religious Accommodation*

Plaintiff's complaint also alleges that he was denied a location to practice his religion and the opportunity to celebrate Ramadan between July 20, 2012 and August 19, 2012. *Dkt. No. 17 at 14–15,* 17. According to plaintiff, his requests to accommodate his observation of the holiday were denied by CCJ security because he was one of the only detainees requesting to honor the holiday and there were only a few Muslim detainees at the CCJ. *Id.* at 14. Plaintiff was further advised that, due to staffing and funding shortages, the CCJ was unable to cater to a specific religious group consisting of only a few participants. *Id.* Plaintiff further claims that his request for the opportunity to engage in congregational prayer, referred to as "Jummah," which is allegedly obligatory to all male Muslims, was denied by prison officials. *Id.* at 15. Plaintiff alleges that he filed grievances concerning these issues within the CCJ and additionally sought redress through outside sources. *Id.* at 15–16.

**C.** *Assault by a Fellow Inmate*

**\*5** On or about November 17, 2012, plaintiff alleges that defendants Blaise and Clancy housed a mentally ill inmate, referred to by plaintiff as "Tiny," in the cell next door to him. *Dkt. No. 17 at 31.* Defendant Clancy apparently could be heard by plaintiff to say, " '[L]ets see if he tries that shit on Brandon!' " *Id.* According to plaintiff, two days later, defendant Blaise directed him to "exit [his] cell and collect all of the trays[.]" *Id.* Plaintiff, however, informed defendant Blaise that, the night before, Tiny had verbally assaulted plaintiff and that he "would rather not pick-up [Tiny]'s tray." *Id.* Defendant Blaise responded by saying to plaintiff, " '[D]on't worry about him, he's a punk. Besides, from what I heard, I'm sure if I let him out, you'd kick his ass.' " *Id.* Tiny thereafter became hostile towards plaintiff and spat on him while defendant Blaise observed. *Id.* Defendant Blaise responded by laughing at plaintiff. *Id.*

**II.** *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about August 8, 2013, and later filed an amended complaint, the currently operative pleading, on August 15, 2014. Dkt. Nos. 1, 17. In his amended complaint, plaintiff names the following defendants:

| *Defendant* | *Position* |
|---|---|
| Dr. Glen Schroyer | CCJ Jail Doctor |

| | |
|---|---|
| Suzanne Kinter | CCJ Nurse |
| Lawrence Bedard | CCJ Food Service Manager |
| Jim Alger | CCJ Corrections Officer |
| Joshua Wingler | CCJ Corrections Officer |
| Thomas Perry | CCJ Corrections Officer |
| Robert Web | CCJ Corrections Officer |
| Eric Blaise | CCJ Corrections Officer |
| Margaret Clansy | CCJ Corrections Sergeant |
| Kevin Laurin | CCJ Corrections Lieutenant |
| County of Clinton.[11] | |

In his amended complaint, which spans forty-four pages comprised of 336 paragraphs, and is accompanied by approximately 177 pages of exhibits, plaintiff chronicles in detail the occurrences at the CCJ giving rise to his claims. The causes of action set forth in that pleading include deliberate medical indifference, failure to permit plaintiff to freely exercise his chosen religion, retaliation, conspiracy, and failure to protect plaintiff from harm. For the sake of clarity, I have included below a table that reflects the court's understanding of the claims asserted against each of the specific defendants.

| Defendant | Claims Asserted |
|---|---|
| Bedard | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct and conspiracy theories of liability); and (5) First Amendment retaliation (direct theory of liability only) |
| Blaise | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); (5) First Amendment retaliation (direct theory of liability only); and (6) Eighth Amendment failure-to-protect (direct theory of liability only) |
| Clancy | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct and conspiracy theories of liability); (5) First Amendment retaliation (direct theory of liability only); and (6) Eighth Amendment failure-to-protect (direct theory of liability only) |
| Kinter | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) |

| | |
|---|---|
| | Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
| Laurin | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
| Perry | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
| Schroyer | (1) First Amendment regarding diet (direct theory of liability only); (2) Eighth Amendment (direct and conspiracy theories of liability); and (3) First Amendment retaliation (direct theory of liability only) |
| Web | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct and conspiracy theories of liability); and (5) First Amendment retaliation (direct theory of liability only) |
| Wingler | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |

On August 3, 2015, defendant Schroyer filed a motion for summary judgment dismissing plaintiff's complaint. *Dkt. No. 75.* On the same date, the county defendants submitted a separate summary judgment motion, also seeking dismissal of plaintiff's claims. *Dkt. No. 77.* The defendants' motions are now fully briefed, and have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*7** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this

initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Defendant Schroyer's Motion*

In his amended complaint, plaintiff claims that defendant Schroyer was deliberately indifferent to his serious medical needs by discontinuing his heart-healthy diet for a period of approximately one month, and that the discontinuation was in retaliation for plaintiff's many grievances concerning his diet at the facility. Plaintiff also alleges that defendant Schroyer conspired with others at the facility to violate his rights under the First and Eighth Amendments.

### 1. *Deliberate Medical Indifference*

Plaintiff's deliberate indifference claim is properly analyzed under the Eighth Amendment, which prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society or which involve the unnecessary and wanton infliction of pain[.]" (*Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quotation marks and citations omitted)). While the Eighth Amendment "does not mandate comfortable prisons, ... neither does it permit inhumane ones[.]" *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment through deliberate indifference to the inmate's serious medical needs must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer,* 511 U.S. at 844; *see also Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin,* 467 F.3d at 280 (quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir. 2003).

**\*8** To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer,* 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40).

Based upon the record now before the court, I conclude that plaintiff cannot meet either element of the governing deliberate indifference test. The only tangible effect of the month-long hiatus in plaintiff's heart-healthy diet was a modest increase in his cholesterol level from 249 to 264. *Dkt. No. 17 at 25–26, 62, 63; Dkt. No. 83 at 5.* According to defendant Schroyer, however, such a fluctuation is within normal limits "and does not place a patient at an increased risk for coronary artery disease, ischemia or stroke." *Dkt. No. 75–6 at 4.* The only "evidence" offered to counter defendant Schroyer's medical opinion is plaintiff's unsupported contention that he was placed at an indiscernible amount of risk for coronary heart disease, ischemia, and stroke as a result of the changed diet. *Dkt. No. 17 at 36; Dkt. No. 83 at 5.* While plaintiff's high cholesterol may constitute a serious medical need –an assertion not disputed by defendants – there is no evidence aside from plaintiff's sheer speculation that defendant Schroyer's decision to remove plaintiff from the heart-healthy diet for one month was objectively sufficiently serious for purposes of a deliberate medical indifference claim.

Moreover, plaintiff has also failed to adduce any evidence to give rise to a genuine dispute of material fact with respect to whether defendant Schroyer removed plaintiff from the heart-healthy diet with the requisite deliberate indifference. In his affidavit, defendant Schroyer states that plaintiff's heart-healthy diet was discontinued on October 16, 2012, because he repeatedly made commissary purchases that were inconsistent with his diet restrictions. *Dkt. No. 75–6 at 4.* Although the parties dispute whether plaintiff was warned ahead of time that his commissary purchases could result in his removal from the diet, *compare Dkt. No. 17 at 27 with Dkt. No. 75–6 at 3,* there is no record evidence that suggests defendant Schroyer's decision on October 16, 2012 was reckless or executed with a disregard to plaintiff's health.

Plaintiff surmises that defendant Schroyer was complicit in a conspiracy to punish him for filing grievances. Specifically, plaintiff contends that, in retaliation for his filing of grievances up through October 15, 2012, regarding his meal trays, defendant Laurin rendered a medical assessment based on plaintiff's commissary purchases and thereafter instructed defendant Schroyer to remove plaintiff from his heart-healthy diet. *Dkt. No. 17 at 25–27.* Aside from plaintiff's sheer conjecture in this regard, however, he has submitted no evidence from which a reasonable factfinder could conclude that defendant Schroyer was aware of the existence of plaintiff's grievances and took action to discontinue plaintiff's heart-healthy diet for punitive reasons.

Because the record before the court, even when construed most favorably toward the plaintiff, fails to contain evidence from which a reasonable factfinder could conclude that plaintiff has met both the objective and subjective requirements for establishing a claim of deliberate medical indifference, I recommend that it be dismissed.

### 2. *Free Exercise*

**\*9** In addition to claiming deliberate medical indifference, plaintiff contends that defendant Schroyer is responsible for denying him an appropriate religious diet, and specifically, one that conformed to his Muslim faith and did not include pork or pork products. [12] Undeniably, plaintiff was entitled to receive a diet that was consistent with his sincerely held religious beliefs. *See, e.g., Johnson v. Guiffere,* No. 04–CV–0057, 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007)* (Hurd, J., *adopting report and recommendation by* Peebles, M.J.). [13] The record, however, demonstrates that at the CCJ, accommodating diet restrictions in accordance with an inmate's religious beliefs is the responsibility of security staff, rather than medical personnel. *See, e.g., Dkt. No. 75–6 at 2; see also Dkt. No. 75–1 at 44,* 50. To counter this, and in an attempt to implicate defendant Schroyer, plaintiff offers only his speculation based upon the fact that, at one point, in response to a sick-call complaint by plaintiff that he was being served pork, defendant Kinter, a nurse at the facility, informed him that his religious diet was still in effect and that she had checked with the kitchen regarding the matter. *Dkt. No. 83 at 3; Dkt. No. 83–3 at 11.* Because this assertion does not contradict defendant Schroyer's contention that medical staff is not responsible for accommodating prisoners' religious dietary needs, it does not suffice to raise a genuine issue of material fact that precludes the entry of summary judgment. In short, I find that no reasonable factfinder could conclude that defendant Schroyer was involved in any violation of plaintiff's religious rights through the failure to provide him a diet consistent with his religious beliefs. I therefore recommend that plaintiff's First Amendment free exercise claim asserted against defendant Schroyer be dismissed.

### 3. *Retaliation*

In his motion, defendant Schroyer does not address the retaliation cause of action asserted against him. Accordingly, while I have not addressed that claim in this report, and therefore recommend it survive defendant's motion, I also recommend that defendant Schroyer be permitted to file a second motion for summary judgment addressing it.

### 4. Conspiracy

Plaintiff's amended complaint includes a conspiracy claim against defendant Schroyer in connection with his deliberate medical indifference cause of action. In light of my recommended finding that the underlying constitutional claim lacks merit and should be dismissed, however, I also recommend that the accompanying conspiracy claim be dismissed. *See Droz v. McFadden,* 580 F.3d 106, 109 (2d Cir. 2009) ("Because neither of the underlying section 1983 causes of action can be established, the claim for conspiracy also fails.").

### C. *County Defendants' Motion*

### 1. *RLUIPA* [14]

To the extent plaintiff intended to assert RLUIPA claims against any of the county defendants in both their official and individual capacities, they are subject to dismissal. As relief, plaintiff's complaint seeks both money damages and declaratory relief. *Dkt. No. 17 at 42–44.* It is now firmly established, however, that the "RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities." *Holland v. Goord,* 758 F.3d 215, 224 (2d Cir. 2014). While plaintiff ordinarily could pursue a claim for injunctive and declaratory relief under the RLUIPA against defendants in their official capacities, *Williams v. Fisher,* No. 11–CV–0379, 2015 WL 1137644, at *17 (N.D.N.Y. Mar. 11, 2015) (Mordue, J., *adopting report and recommendation by* Dancks, M.J.), such claims are now moot based upon plaintiff's transfer out of the CCJ. *See Shepherd v. Goord,* 662 F.3d 603, 610 (2d Cir. 2011) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."). Accordingly, I recommend that plaintiff's RLUIPA claim asserted against the county defendants be dismissed.

### 2. *Conspiracy*

**\*10** Plaintiff alleges that there was a "meeting of the minds" among some of the defendants to deprive him of his civil rights. *See, e.g., Dkt. No. 17 at 25,* 27–29. Specifically, he contends that defendant Laurin evaluated plaintiff's commissary purchases on or about October 15, 2012, and decided that plaintiff's purchases were inconsistent with his heart-healthy diet. *See Dkt. No. 17 at 24* ("Said conspiracy was initiated on October 15, 2012, as Laurin made a medical assessment stating my commissary buys is a form of non-compliance to my special diet."). Defendant Laurin thereafter allegedly communicated his "assessment" to defendants Schroyer and Kinter and the three arrived at an agreement to remove plaintiff from the heart-healthy diet. *See id.* at 25 ("Kinter concurred [with] said assessment [and] Schroyer rubber-stamped it into effect.... Thus, on October 16th, 2012, said conspiracy went into effect; Kinter informed me of the removal of all previously issued diets, stating I'm not complying to said diets based on my commissary purchases."). Plaintiff also specifically implicates defendant Bedard in his conspiracy claim, accusing him of "enforc[ing]" the decision by defendants Schroyer and Kinter to remove him from his special diets and intentionally accelerating the conspiracy by mislabeling his food thereafter to reflect that his meals did not contain pork. *Id.* at 25, 27. To further defendant Bedard's alleged "viciousness," he "established a meeting of the minds with Clansy and Web." *Id.* at 27. According to plaintiff, defendant Clancy furthered the conspiracy by admitting to plaintiff that the CCJ kitchen made a mistake on October 17, 2012, by serving plaintiff a meal containing pork products. *Id.* at 28. On November 5, 2012, defendant Web allegedly fielded a concern by plaintiff that his food contained pork by reaching out to the CCJ kitchen, who told Web that the meat was actually turkey. *Id.* at 29. Plaintiff contends that defendant Web's refusal to disclose who he spoke to in the kitchen perpetuated the conspiracy initiated by defendants Laurin, Kinter, and Schroyer. [15] *Id.*

"To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights are not sufficient to support a cognizable claim under section 1983. *Sommer v. Dixon,* 709

F.2d 173, 175 (2d Cir. 1983); *Pinaud v. Cnty. of Suffolk,* 52 F.3d 1139, 1156 (2d Cir. 1995).

In this case, although plaintiff's allegations regarding the extent of the conspiracy are detailed, there is no evidence in the record to support them. While defendant Kinter confirms that she discussed the decision to remove plaintiff from his heart-healthy diet with defendants Laurin and Schroyer prior to October 16, 2012, there is no record evidence to suggest that the decision was motivated by plaintiff's previously filed grievances or any other reason aside from plaintiff's commissary purchases. *Dkt. No. 7710 at 3–4.* According to defendant Kinter, plaintiff's commissary purchases were monitored by medical staff from July 25, 2012 until September 30, 2012, because "[p]laintiff showed little medical improvement after [his] dietary restrictions had been implemented." *Id.* at 3. A review of plaintiff's commissary purchases, submitted by way of commissary receipts in support of the county defendants' motion, supports defendants' assertion that plaintiff was purchasing foods that were inconsistent with a low-fat, low-cholesterol diet during the relevant time period. *Dkt. No. 77–4 at 2–5.* Plaintiff's bare allegation with respect to the alleged "meeting of the minds" in this respect is not sufficient to defeat the county defendants' motion.

Similarly, plaintiff's allegations in his amended complaint are insufficient to give rise to a genuine dispute of material fact regarding whether defendant Bedard furthered any conspiracy by mislabeling his food. Aside from plaintiff's own allegation, there is no evidence that defendant Bedard did, in fact, mislabel any of plaintiff's meals. In addition, there is no evidence in the record to suggest that defendant Bedard acted maliciously in preparing plaintiff's meals, and he states that the CCJ kitchen staff prepared plaintiff's food "in accordance with the records and notifications [they] had on file for him." *Dkt. No. 77–11 at 4.* Defendant Bedard also explained that, "[t]o the extent the Plaintiff grieved of being served pork he would either be provided a replacement meal, or as was most often the case, be instructed that the food being served was not pork at all, but rather a different type of food such as turkey." *Id.*

**\*11** With respect to plaintiff's allegations that defendant Clancy conspired with defendant Bedard to maliciously mislabel plaintiff's food, again, aside from plaintiff's own contentions in his amended complaint, there is no evidence in the record to support this claim. While plaintiff contends that "a meeting of the minds was established when [defendant

Clancy] admitted to speaking to the Kitchen staff" on October 18, 2012, regarding plaintiff having received a meal containing pork in it the day prior, there is no evidence regarding the identity of the person with whom she spoke. *Dkt. No. 17 at 28.* Any contention by plaintiff that defendant Clancy spoke to defendant Bedard or that the two agreed to violate plaintiff's rights at that time is pure conjecture. In any event, plaintiff alleges that defendant Clancy explained to him that he received the meal from the day prior by mistake due to a new CCJ staff employee's error. *Id.* at 19. Contrary to plaintiff's allegations of a large-scale conspiracy to violate plaintiff's rights, defendant Clancy immediately provided him with a new meal. *Dkt. No. 775 at 26.*

There is also no evidence that defendants Bedard and Web conspired. While plaintiff speculates in his amended complaint that "[a] meeting of the minds was established by Web and Bedard" regarding a meal plaintiff was provided on November 5, 2012, there is no other evidence to suggest that those two individuals ever spoke. *Dkt. No. 17 at 29.* According to plaintiff's own allegations, in response to his complaint that his meal on that date contained pork, defendant Web contacted the CCJ kitchen and then informed plaintiff the meat product was turkey, not pork. *Id.* at 21–22. There is no record of the identity of the person with whom defendant Web spoke, rendering plaintiff's allegation that it was defendant Bedard (and the allegation that the two agreed to violate plaintiff's rights) mere speculation.

For all of the reasons discussed above, I find no evidence from which a reasonable factfinder could conclude that defendants Laurin, Kinter, Bedard, Web, and Clancy conspired to violate plaintiff's constitutional rights.

In addition, plaintiff's conspiracy claim appears to be precluded by the intra-agency, or intra-corporate, conspiracy doctrine, which provides "the officers, agents, and employees of a single corporate entity, each acting within the scope of her employment, are legally incapable of conspiring together." [16] *Little v. City of N.Y.,* 487 F.Supp.2d 426, 441–42 (S.D.N.Y. 2007).* Because defendants Laurin, Kinter, Bedard, Clancy, and Web are all employees of the County of Clinton, and plaintiff's own allegations suggest that each of them was acting within the scope of his or her employment at the relevant times, plaintiff's conspiracy claims are precluded by virtue of the intra-corporate conspiracy doctrine.

Although plaintiff's amended complaint mentions, in passing, 42 U.S.C. § 1985, there is no record evidence to support

a conspiracy claim against the defendants under section 1985(3). To sustain a cause of action for conspiracy to violate civil rights under that provision, a plaintiff must demonstrate that defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his equal protection of the laws, or of equal privileges and immunity secured by law. *United Bhd. of Carpenters & Joiners, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 835 (1983); *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir. 1994). "To establish such intentional or purposeful discrimination, it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently." *Gagliardi,* 18 F.3d at 193. A plaintiff asserting a claim under section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can be demonstrated through circumstantial evidence that "shows the parties have a tacit understanding to carry out the prohibited conduct." *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir. 1995) (quotation marks omitted).

**\*12**  In this case, there is no record evidence, including any allegations in plaintiff's amended complaint, regarding race-based animus or that plaintiff's membership in a suspect class provided motivation for the defendants' conduct. Indeed, the plaintiff's theory appears to be that it was his filing of grievances, and not his race, that motivated the defendants to take adverse action against him. Accordingly, I recommend plaintiff's section 1985(3) cause of action be dismissed on the merits.

### 3. *Free Exercise (Regarding Plaintiff's Ramadan and Congregational Prayer Allegations) and Retaliation*

Citing plaintiff's alleged failure to exhaust the available administrative remedies prior to filing this lawsuit, defendants seek dismissal of plaintiff's (1) free exercise claims to the extent they are based on allegations that plaintiff was deprived of the opportunity to participate in (a) Ramadan during July and August 2012, and (b) congregational Jummah services; and (2) retaliation claims.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In the event the defendant establishes that the inmate plaintiff failed "to fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy,* No. 04–CV– 0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *accord, Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir. 2007).[17]

As an inmate at the CCJ, plaintiff had available to him a grievance process for use in complaining of prison conditions. *Dkt. No. 77–14 at 3.* In accordance with the prescribed grievance procedure, an inmate complaining of prison conditions must first request a grievance form from one of the corrections officers on duty. *Id.* At that point the corrections officer must make an attempt to resolve the grievance informally. *Id.* If those efforts are unsuccessful, a formal grievance must be filed, and the matter is then investigated by defendant Laurin, as the inmate grievance coordinator, who, following his investigation, makes a decision concerning the matter. *Id.* In the event the inmate is dissatisfied with defendant Laurin's decision, he may appeal it to the Citizens Policy and Complaint Review Council ("CPCRC"). *Id.* If a plaintiff fails to follow each of the required steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange,* 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

**\*13**  The record reflects that plaintiff availed himself of the grievance process on several occasions during the course of

his incarceration at the CCJ. [18] *Dkt. No. 17 at 78–161; Dkt. No. 77–5 at 2–47; Dkt. No. 93–4 at 76170.* None of those grievances, however, appear to relate to the alleged failure of prison officials to permit him to observe Ramadan, to engage in congregate prayer, or retaliation by any defendants. *Id.* In his response to the county defendants' motion, plaintiff argues that, with "respect to Ramadhan and Congregational Prayer, not only did Plaintiff grieve these deprivations [sic], but for exhaustion purposes, he went to the extent of appealing to the direct attention of CPCRC – just as he did all of his other claims." *Dkt. No. 93–2 at 40.* The grievances to which plaintiff cites in support of this contention, however, do not relate to being deprived access to religious services, the right to participate in Ramadan, or retaliation. *Dkt. No. 93–4 at 167–171.* Thus, it appears that plaintiff has failed to exhaust the available administrative remedies with respect to these causes of action.

Plaintiff's failure to exhaust, however, does not warrant dismissal of the amended complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. N.Y.,* 380 F.3d 680, 686 (2d Cir. 2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

Plaintiff contends that he should be excused from the exhaustion requirement because, on the morning that Ramadan began in July 2012, the "Shift Officer" threatened plaintiff with physical violence. *Dkt. No. 93–2 at 40.* There is no evidence in the record, aside from plaintiff's allegations, however, that this threat actually occurred or that the assault

of another Muslim inmate from the previous day, to which the Shift Officer referred in threatening plaintiff, actually occurred. In any event, according to plaintiff's own amended complaint, on a different occasion, when he was allegedly threatened by defendant Clancy on or about October 18, 2012 about filing a grievance concerning a meal, he, in fact, complained to defendant Laurin "about Clansy's [sic] threat." *Dkt. No. 17 at 19.* This demonstrates that plaintiff had a history of ignoring threats by some corrections officers and suggests he did not find the threat of CCJ security staff necessarily compelling. Most persuasive to me in recommending that the court find that there are no circumstances that exist to excuse plaintiff's failure to exhaust, however, is that courts in this circuit have concluded that the type of vague threat, allegedly directed toward plaintiff by an unidentified individual, cannot serve as a basis for finding an inmate excused from the PLRA exhaustion requirement. *See Singh v. Lynch,* 460 Fed.Appx. 45, 4748 (2d Cir. 2012) ("The test for determining the availability of grievance procedures to a prisoner is objective.... Singh's subjective fear of retaliatory physical harm derives from two facts: the unreported June 6, 2005 assault and other inmates' warnings that Lynch was out to get him. The former fact cannot, by itself, support an objective finding that grievance procedures were unavailable.... As for the alleged inmate warnings, in the absence of any particulars indicating that Lynch was looking to do more than harass Singh ..., this fact cannot support a finding that grievance procedures for an assault claim were effectively unavailable."); *Harrison v. Stallone,* No. 06–CV–0902, 2007 WL 2789473, at *6 (N.D.N.Y. Sept. 24, 2007) (Kahn, J., *adopting report and recommendation by* DiBianco, M.J.) (concluding that the plaintiff was not excused from exhausting available administrative remedies even where the plaintiff alleged in his complaint that he did not file a grievance because he was " 'afraid of retaliation' " and he stated in opposition to the defendants' motion for summary judgment that "he had a 'legitimate fear' of retaliation because his substantive claim is one for retaliation"). To hold otherwise would permit an exception that would be easily and often incanted by inmates, and would potentially eviscerate the PLRA's exhaustion rule. *Harrison,* 2007 WL 2789473, at *6.

### 4. *Personal Involvement*

**\*14** Defendants seek dismissal of the claims asserted against defendants Bedard, Blaise, Clancy, Perry, Web, and Wingler, arguing that there is no evidence in the record from

which a reasonable factfinder could conclude that any of those individuals were personally involved in the alleged unconstitutional conduct.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Iqbal,* 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.,* No. 91–CV–8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

In the event the recommendations above are adopted, the remaining claims for consideration against the county defendants in this regard are plaintiff's deliberate medical indifference claim and his free exercise claim regarding his dietary restrictions. At the outset of my analysis, it is worth noting that the thrust of defendants' arguments with respect to whether the defendants considered below were personally involved is aimed at whether they are in fact *responsible* for the conduct alleged by plaintiff. *See, e.g., Dkt. No. 77–19 at 24* ("Although these Defendants had interactions with the Plaintiff, they did not have any authority to alter Plaintiff's medical/dietary restrictions. They simply attempted to ensure that Plaintiff was provided a proper meal and provided him with a replacement meal if need be."). Because a personal involvement inquiry on summary judgment examines only whether there is record evidence to support a factfinder's conclusion that the individual under consideration was involved in the alleged conduct, I have limited my analysis to that particular question in this part of the report.

### a. *Defendant Bedard*

Plaintiff contends that defendant Bedard violated his rights by (1) enforcing the decision by defendants Schroyer and

Kinter to remove him from his heart-healthy diet in October 2012, and (2) serving him meals that contained pork. Defendant Bedard's own affidavit discloses that he was personally involved by admitting that he discussed the status of plaintiff's meal restrictions with some of the other named defendants. *Dkt. No. 77–11 at 4.* In addition, defendant Bedard stated that, "[w]hen asked, [he] would discuss the components or ingredients of meals with the [corrections officers], and how this related to any restrictions the kitchen had on file for various inmates, in attempts to resolve any issues regarding an inmate being served a non-compliant meal." *Id.* In light of these statements, and considered in conjunction with plaintiff's allegations that CCJ corrections officers phoned the CCJ kitchen following his complaints about his food containing pork (and some of the grievances reflecting the same), I find that reasonable factfinder could conclude that defendant Bedard was personally involved in the alleged conduct giving rise to plaintiff's deliberate medical indifference cause of action and free exercise claim regarding his religious dietary restrictions.

### b. *Defendant Blaise*

**\*15** There is no record evidence that defendant Blaise was involved in either plaintiff's medical indifference or free exercise claim. Indeed, there are no allegations in the amended complaint, nor has plaintiff subsequently alleged, that defendant Blaise was involved in providing or denying him meals at any time. [19] Plaintiff has acknowledged this in his response to the county defendants' motion. *See Dkt. No. 93–2 at 54* ("For the purpose of clarity, nowhere within the Amended Complaint is it alleged that Blaise deprived Plaintiff of meals or any of his various diets."). Accordingly, I recommend that plaintiff's medical indifference claim and free exercise claim regarding his religious diet be dismissed.

### c. *Defendant Clancy*

Turning first to plaintiff's deliberate medical indifference cause of action, there is no record evidence from which a reasonable factfinder could conclude that defendant Clancy was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Clancy.

Plaintiff alleges, however, and there is evidence in the record confirming that defendant Clancy responded to at least one of

plaintiff's complaints regarding whether his meal contained pork. *Dkt. No. 17 at 1819; Dkt. No. 93–4 at 116–17*. As a CCJ Corrections Sergeant, defendant Clancy is considered a supervisory official, and, in that capacity, she may be found personally liable for a constitutional violation in the event she learned of a constitutional violation through a report or appeal and failed to remedy the wrong. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* 556 U.S. 554 (2009); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright,* 21 F.3d at 501. Because there is evidence in the record that reflects defendant Clancy learned that plaintiff received a meal that did not comport with his religious dietary restrictions, I recommend defendants' motion be denied to the extent that it seeks dismissal of plaintiff's free exercise claim asserted against defendant Clancy on the basis of personal involvement.

#### d. *Defendant Perry*

Turning first to plaintiff's deliberate medical indifference cause of action against this defendant, there is no record evidence from which a reasonable factfinder could conclude that defendant Perry was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Perry.

As to plaintiff's free exercise claim, plaintiff contends that, on December 25, 2012, defendant Perry responded to his complaint that his meal consisted of "pork rib-eye." *Dkt. No. 17 at 22–23*. Plaintiff requested a grievance form from defendant Perry, and the copy of the completed form that is in the record confirms that defendant Perry responded to plaintiff's request for a new meal. *Dkt. No. 93–4 at 164*. Thus, the record establishes that defendant Perry was involved in the alleged violation of plaintiff's free exercise rights on at least one occasion. For this reason, I recommend defendants' motion be denied to the extent that it seeks dismissal of plaintiff's free exercise claim asserted against defendant Perry on the basis of personal involvement.

#### e. *Defendant Web*

**\*16** Like defendants Blaise, Clancy, and Perry, there is no record evidence from which a reasonable factfinder could conclude that defendant Web was involved in denying

plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Web.

Turning to plaintiff's free exercise claim, the amended complaint alleges that, on November 5, 2012, plaintiff complained to defendant Web that his meal contained pepperoni. *Dkt. No. 17 at 21*. In response, defendant Web allegedly told plaintiff that the meat was turkey ham, not pork, and thereafter called the CCJ kitchen to confirm that the meat was not pork. *Id.* at 21–22. Although plaintiff alleges that he field a grievance regarding this incident, there is no copy of the grievance in the record before the court. *Id.* at 22; *Dkt. No. 93–4 at 76–171*. In his affidavit submitted in support of the county defendants' motion, defendant Web admits to "recall[ing] an occurrence of which the Plaintiff was complaining that he was served pork in contradiction to his religious diet. However the food he claimed was pork was actually turkey." *Dkt. No. 77–16 at 2*. In light of this additional record evidence supporting plaintiff's version of the events on November 5, 2012 as alleged in his amended complaint, I find there is a dispute of material fact as to whether defendant Web was personally involved in depriving plaintiff of a meal consistent with his religious diet on that date.

#### f. *Defendant Wingler*

Plaintiff's claims against defendant Wingler stem from allegations that, on two occasions, defendant Wingler ignored plaintiff's complaints that his meals contained tomatoes in violation of his medical dietary restrictions. *Dkt. No. 17 at 7; Dkt. No. 93–2 at 58*. The record evidence includes two grievances, one dated October 3, 2012 and the second October 28, 2012, that confirm, at least, that (1) plaintiff complained of being served tomato products on those dates and (2) defendant Wingler addressed those complaints. *Dkt. No. 93–4 at 92, 139*. Therefore, I find there is sufficient evidence from which a reasonable factfinder could conclude that defendant Wingler was personally involved plaintiff's allegations that he was deprived of medically compliant meals.

With respect to plaintiff's free exercise claim asserted against defendant Wingler, however, there are no allegations in the amended complaint, and plaintiff has failed to subsequently submit any proof, reflecting that defendant Wingler was ever involved in providing or depriving plaintiff of any meals that were not in accordance with his religion. For that reason,

I recommend plaintiff's free exercise claim in this regard against defendant Wingler be dismissed.

### 5. *Remaining Claims/Defendants*

#### a. *Plaintiff's Deliberate Medical Indifference Claim Asserted Against Defendants Laurin, Kinter, Bedard, and Wingler*

As discussed above in Part III.B. of this report with respect to defendant Schroyer, I find that there is no record evidence from which a reasonable factfinder could conclude that the alleged conduct of defendants Laurin, Kinter, Bedard, and Wingler was sufficiently serious to satisfy the objective element of a deliberate medical indifference cause of action. In particular, there is no record evidence, aside from plaintiff's allegation that he suffered an indiscernible amount of risk for a heart attack and stroke, that removing him from his heart-healthy diet for one month is constitutionally significant. *See, e.g., Cleveland v. Eagleton,* No. 14–CV–2444, 2015 WL 8919463, at *5 (D.S.C. Nov. 12, 2015) (finding that removing the plaintiff from his cholesterol medicine and his heart-healthy diet does not satisfy the objective element of a medical indifference claim). Because plaintiff cannot establish one of the required elements of the claim, I recommend that his deliberate medical indifference cause of action be dismissed as to defendants Laurin, Kinter, Bedard, and Wingler.

#### b. *Plaintiff's Free Exercise Claim (Regarding his Religious Dietary Restrictions) Asserted Against Defendants Laurin, Kinter, Bedard, Clancy, Perry, and Web*

**\*17** While inmates confined within prison facilities are by no means entitled to the full gamut of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that provision does afford them at least some measure of constitutional protection, including their right to "a diet consistent with [their] religious scruples." *Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir. 1992); *see also Pell v. Procunier,* 417 U.S. 817, 822 (1974) ("In the First Amendment context ... a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."). That right, however, is not without limits, and the task of defining the contours of that

right in a prison setting requires striking a delicate balance between the rights of prison inmates and the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348–49 (1987); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003); *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir. 1990).

As a threshold matter, "[t]he prisoner must show ... that the disputed conduct substantially burdens his sincerely held religious beliefs." [20] *Salahuddin,* 467 F.3d at 274–75. In evaluating this factor, the court must be wary of " 'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.' " *McEachin,* 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699 (1989)). Instead, a court should consider only whether the particular plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford,* 352 F.3d at 588 (quotation marks omitted). Once a plaintiff satisfies this burden, defendants must then "bear the relatively limited burden of identifying the legitimate penological interests that justifying impinging conduct." *Salahuddin,* 467 at 275. "[T]he burden [, however,] remains with the prisoner to 'show that these penological concerns were irrational.' " *Ford,* 352 F.3d at 595 (quoting *Fromer v. Scully,* 874 F.2d 69, 74 (2d Cir. 1989)) (alteration omitted).

In this case, there is evidence in the record to support a factfinder's conclusion that plaintiff was initially served a meal that contained pork, which is inconsistent with his religious beliefs, on only ten occasions between March 28, 2012 and December 25, 2012. Specifically, a review of the record evidence, including the allegations in plaintiff's amended complaint, reveal that plaintiff was initially served meals containing pork on (1) June 21, 2012; (2) July 4, 2012; (3) September 24, 2012 at lunch; (4) September 24, 2012 at dinner; (5) October 9, 2012; (6) October 10, 2012; (7) October 17, 2012; (8) October 29, 2012; (9) November 5, 2012; and (10) December 25, 2012. *Dkt. No. 17 at 13,* 18, 20, 21, 22, 66, 67; *Dkt. No. 93–4 at 82–85,* 94–99, 116–17, 164–65. On September 24, 2012, plaintiff learned that the meat in his meals was vegetarian bacon. *Id.* at 83, 85. Similarly on October 10, 2012, plaintiff was told that the meat was turkey ham, not pork. *Id.* at 99. Nevertheless, there is evidence suggesting that on October 10, 2012 and December 25, 2012, his meal was replaced. *Id.* at 96, 164. While there is a dispute in the record regarding precisely when the CCJ

learned of plaintiff's religious dietary restrictions, it is clear from the record that plaintiff may have been served pork only on ten dates during his one-year incarceration at the CCJ. This is not constitutionally significant and does not give rise to a dispute of fact regarding whether his First Amendment rights were substantially burdened. *See Norwood v. Strada, 249 Fed.Appx. 269, 272 (3d Cir. 2007)* (finding that the denial of seven consecutive religious meals did not substantially burden the plaintiff's free exercise rights); *Washington v. Afify, 968 F.Supp.2d 532, 538 (W.D.N.Y. 2013)* ("Courts have generally held that incidents that are isolated, or few in number, involving religiously-mandated food, do not give rise to a First Amendment claim." (citing cases)); *Evans v. Albany Cnty. Corr. Facility, No. 05–CV–1400, 2009 WL 1401645, at *8 (N.Y.N.D. May 14, 2009)* (Suddaby, J.) (finding the plaintiff's allegations that he was served eighteen "wrong meals" out of an approximate 354 meals was constitutionally de minimis); *Odom v. Dixion, No. 04–CV–0889, 2008 WL 466255, at *11 (W.D.N.Y. Feb. 15, 2008)* (finding the plaintiff's allegation that the defendants failed to provide him with kosher meals on five of the fifteen days he was in keeplock confinement did not give rise to a cognizable constitutional violation). Accordingly, I recommend this claim be dismissed as to defendants Laurin, Kinter, Bedard, Clancy, Perry, and Web.

### c. *Plaintiff's Failure–to–Protect Claim Asserted Against Defendants Blaise and Clancy*

**\*18** The county defendants do not seek dismissal of this claim in their summary judgment papers. For that reason, I recommend that the claim survive this motion but that defendants Blaise and Clancy be permitted an opportunity to file a second motion for summary judgment specific to this remaining claim.

### IV. *SUMMARY AND RECOMMENDATION*

A careful review of the evidence currently before the court demonstrates that no reasonable factfinder could conclude that any of the defendants were deliberately indifferent to plaintiff's medical needs, based upon a decision to remove him from his heart-healthy diet for a period of one month. Addressing plaintiff's religious claims, his assertion that his religious rights were violated when prison officials failed to permit him to celebrate Ramadan and to engage in congregational prayer are precluded based upon his failure to exhaust available administrative remedies before filing this action. Similarly, his retaliation claims are also not

properly exhausted. Plaintiff's free exercise claim regarding his religious diet is also subject to dismissal in light of the absence of any evidence from which a reasonable factfinder could conclude that his rights were substantially burdened. Because defendant Schroyer did not seek dismissal of the plaintiff's retaliation claim, I recommend that cause of action survive defendant Schroyer's motion but he be permitted to file a second motion for summary judgment addressing it. Similarly, the county defendants did not address plaintiff's failure-to-protect claim asserted against defendants Blaise and Clancy and, accordingly, I recommend that claim survive but that those individuals be permitted to file a motion for summary judgment regarding that single claim.

Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendant Schroyer's motion for summary judgment (*Dkt. No. 75*) be GRANTED to the extent it seeks dismissal of plaintiff's claims against him, with the exception of plaintiff's retaliation claim and that the motion be DENIED as to that claim; and it is further

RECOMMENDED that the motion for summary judgment submitted by defendants Bedard, Blaise, Clancy, Laurin, Kinter, Perry, Web, and Wingler (*Dkt. No. 77*) be GRANTED to the extent it seeks dismissal of plaintiff's claims asserted against all defendants, with the exception of plaintiff's failure-to-protect claim asserted against defendants Blaise and Clancy and that the motion be DENIED as to that claim; and it is further

RECOMMENDED that defendant Schroyer be permitted to file a second motion for summary judgment addressing the retaliation claim not addressed in his first motion, and that defendants Blaise and Clancy be permitted to file a second motion for summary judgment addressing the failure-to-protect claim not addressed in their first motion.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993)*.

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Slip Copy, 2016 WL 1638242

Footnotes

1    In his amended complaint, plaintiff alleges that he weighed 275 pounds upon his initial entry into the CCJ, and 225 pounds upon his transfer into the custody of the DOCCS. *Dkt. No. 17 at 11.* In a memorandum submitted in opposition to defendants' motions, however, plaintiff claims to have lost "about 175 lbs to 130 lbs" while confined in the CCJ due to the deprivation of meals. *Dkt. No. 93–2 at 62.*

2    A more precise description of the claims asserted against the defendants is included below in Part II. of this report.

3    The order was later reiterated on July 5, 2012. *Dkt. No. 17 at 50; Dkt. No. 75–1 at 40.*

4    In his affidavit, defendant Schroyer states that plaintiff was repeatedly counseled by medical staff concerning his non-compliance with his restrictive diets, and was warned, prior to October 16, 2012, that continued non-compliance would result in removal of the dietary restrictions. *Dkt. No. 75–6 at 3.* This assertion is sharply contested by plaintiff, who contends that the restrictions were lifted without warning. *Dkt. No. 83 at 3–4.* Plaintiff notes, moreover, that defendant Schroyer responded as follows to one of his interrogatories:

> *Interrogatory No. 15:*
>
> Did Dr. Schroyer or anyone else within the Medical–Staff notify Plaintiff that purchasing or consuming certain items from commissary would result in the removal (cancellation) of his dietary restriction at anytime [sic] on or before October 16, 2012?
>
> *Answer to Interrogatory No. 15:*
>
> The applicable medical records indicate that a discussion was held between the defendant and plaintiff on October 16, 2012 regarding plaintiff's non-compliance with his low fat/low cholesterol diet. The records further indicate that the proposed plan discussed in response to such noncompliance and plaintiff's assertion that he would, 'not be compliant with any diet' was the removal of such diet.
>
> *Dkt. No. 83–3 at 25.* While this presents a disputed question of fact, as will be discussed below in Part III.B.1. of this report, it is not material to plaintiff's deliberate medical indifference claims against defendant Schroyer.

5    Plaintiff's amended complaint makes reference, in this regard, to Exhibit E. *Dkt. No. 17 at 13.* Relevant portions of the referenced document, however, are illegible. *Id.* at 65. The document is reproduced at *Dkt. No. 83–3 at 2* and *Dkt. No. 93–4 at 68,* and again, half of the document cannot be deciphered.

6    Plaintiff alleges that defendant Kinter authored the response to this sick-call request. *Dkt. No. 17 at 14.* It is not clear, however, that this is accurate because in response to other sick-call requests, defendant Kinter would sign "SK." *See, e.g. id.* at 65. The sick-call response dated July 5, 2012 was signed, "S.F. RN." *Id.* at 67.

7    The record is unclear as to how long plaintiff was confined in the CCJ after his initial intake on January 14, 2012. Plaintiff's amended complaint does not state whether he received any meals containing pork between that initial intake and his re-arrest in March and, if so, how many.

8    Plaintiff's booking sheet from his rearrest in March 2012 also includes a note that reads, "Cautionary: Muslim Diet." *Dkt. No. 17 at 210.*

9    Defendants characterize plaintiff's accusation as "eccentric" and "evidence of his paranoia." *Dkt. No. 95–3 at 6.* While the court takes no position on these characterizations, it is worth noting that defendants do not dispute plaintiff's contention that the notice was altered. *Id.*

10    Defendants contest whether some of those meals included pork or pork products. *See, e.g., Dkt. No. 77–19 at 9.*

11    Defendants County of Clinton and Alger were dismissed from the action by District Judge Gary L. Sharpe in a decision and order dated August 15, 2015. *Dkt. No. 16.*

> For purposes of this report, the following defendants will be collectively referred to as the "county defendants": (1) Suzanne Kinter, (2) Lawrence Bedard, (3) Joshua Wingler, (4) Thomas Perry, (5) Robert Web, (6) Eric Blaise, (7) Margaret Clancy, and (8) Kevin Laurin.

12    Even liberally construed, plaintiff's amended complaint does not assert a First Amendment free exercise cause of action against defendant Schroyer with respect to plaintiff's allegations that he was denied the opportunity to participate in Ramadan and/or congregational services. For that reason, I have not analyzed that claim in the context of defendant Schroyer's motion.

**13** Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

**14** While plaintiff's amended complaint mentions in passing the RLUIPA, it does not expressly state a claim under that provision. *See, e.g., Dkt. No. 17 at 16,* 36–42. Nonetheless, mindful that the court is required to construe a *pro se* litigant's pleadings to raise the strongest arguments suggested, *Walker v. Schult,* 717 F.3d 119, 124 (2d Cir. 2013), I have considered plaintiff's amended complaint to assert a cause of action under that provision, as well.

**15** To be clear, then, in light of all of the allegations described above, I have construed plaintiff's amended complaint as asserting (1) a deliberate medical indifference claim against defendants Schroyer, Laurin, Kinter, and Bedard based on a conspiracy theory of liability; and (2) free exercise and RLUIPA claims regarding plaintiff's religious dietary restrictions against defendants Bedard, Clancy, and Web based on a conspiracy theory of liability. In addition, although plaintiff contends that defendants Clancy and Blaise conspired to violate his rights with respect to the incident involving another inmate on or about November 17, 2012, *see, e.g, Dkt. No. 17 at 31,* I have construed and analyzed those allegations as giving rise to an Eighth Amendment failure-to-protect cause of action, which I will address more completely below in Part III.C.5.c. of this report.

**16** The doctrine is rooted in the Sherman Antitrust Act, 15 U.S.C. § 1, and, although it was developed in the context of business entities, since its inception has been expanded to apply to business corporations and public entities, as well. *Everson v. N.Y. City Transit Auth.,* 216 F.Supp.2d 71, 75–76 (E.D.N.Y. 2002)

**17** While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir. 2004) (emphasis omitted)).

**18** Plaintiff contends that some of his grievances were intentionally lost or destroyed by CCJ staff. *See, e.g., Dkt. No. 17 at 20.*

**19** Instead, plaintiff has maintained that defendant Blaise is responsible for housing a mentally ill inmate next door to plaintiff's cell and asking plaintiff to retrieve the inmate's meal tray knowing that plaintiff may be assaulted by the inmate. *Dkt. No. 17 at 31–32; see also Dkt. No. 93–2 at 54–56.* Those allegations will be addressed in Part III.C.5.c. of this report.

**20** The Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme Court's decision in *Emp't Div. v. Smith,* 494 U.S 872, 887 (1990), in which the Court suggested that application of the test "puts courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.' " *Ford v. McGinnis,* 352 F.3d 582, 592 (2d Cir. 2003) (quoting *Emp't Div.,* 494 U.S. at 887); *see also Holland v. Goord,* 758 F.3d 215, 220–21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, I have applied the substantial-burden test in this matter.

---

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New
York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York, New
York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary judgment
and dismissing the amended complaint, and United States
Magistrate Judge James C. Francis IV having issued a report
and recommendation, dated August 20, 1999, recommending
that the motion be granted, and upon review of that report and
recommendation together with plaintiff's letter to this Court,
dated August 28, 1999, stating that plaintiff does "not contest
the dismissal of this action", it is

ORDERED that the attached report and recommendation of
United States Magistrate Judge James C. Francis IV, dated
August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary
judgment is granted, and the amended complaint is dismissed;
and it is further

ORDERED that the Clerk of the Court shall enter judgment
accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42 U.S.C.
§ 1983. Mr. Cole alleges that the defendant Richard Pflueger,
a corrections officer, violated his First Amendment rights
by refusing to allow him to attend religious services. The
defendant now moves for summary judgment pursuant to
Rule 56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, I recommend that the defendant's
motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate
in the custody the New York State Department of
Correctional Services ("DOCS"), incarcerated at the Green
Haven Correctional Facility. (First Amended Complaint
("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993,
the plaintiff was in keeplock because of an altercation with
prison guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock
is confined to his cell for twenty-three hours a day with
one hour for recreation. (Affidavit of Anthony Annucci
dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS policy, inmates
in keeplock must apply for written permission to attend
regularly scheduled religious services. (Reply Affidavit of
George Schneider in Further Support of Defendants' Motion
for Summary Judgment dated September 9, 1996 ("Schneider
Aff.") ¶ 3). Permission is granted unless prison officials
determine that the inmate's presence at the service would
create a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green Haven
is for the captain's office to review all requests by inmates
in keeplock to attend religious services. (Schneider Aff. ¶ 3).
Written approval is provided to the inmate if authorization
is granted. (Affidavit of Richard Pflueger dated April 26,
1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the
appropriate form to the gate officer before being released to
attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request
to attend the Muslim services on July 2, 1993. (Request
to Attend Scheduled Religious Services by Keep–Locked
Inmate dated June 28, 1993 ("Request to Attend Services"),

attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se*, his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22,

1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at [*]5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being

released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 4774731
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Stanley HILBERT, Plaintiff,

v.

Brian FISCHER, et al., Defendants.

No. 12 Civ. 3843(ER).
|
Sept. 5, 2013.

**OPINION AND ORDER**

EDGARDO RAMOS, District Judge.

**\*1** Plaintiff Stanley Hilbert ("Plaintiff"), proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983, the Americans With Disabilities Act and the Rehabilitation Act against Brian Fischer, Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"); Green Haven Correctional Facility ("Green Haven") Superintendent William Lee; and various Green Haven "contractors and employees" (collectively, the "Defendants").[1] Presently before the Court is Defendants' motion to partially dismiss Plaintiff's Amended Complaint.[2] Doc. 65. Specifically, Defendants seek dismissal of Plaintiff's claim of deliberate medical indifference for failure to exhaust administrative remedies. Defendants Fischer and Lee move in the alternative to dismiss Plaintiff's deliberate indifference claim because Plaintiff has failed to demonstrate that they were personally involved in the alleged Constitutional violation. For the reasons discussed below, Defendants' motion for partial dismissal of the Amended Complaint is GRANTED.

**I. Factual Background**
The Court accepts the factual allegations in the Amended Complaint as true for purposes of Defendants' motion. *Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 108 (2d Cir.2010).

In September 2011, Plaintiff was incarcerated at Marcy Correctional Facility's ("Marcy") Residential Mental Health Unit ("RMHU"). Amended Complaint ("Am.Compl.") ¶ 42. Plaintiff sought mental health treatment at that facility;

however, due to the unavailability of observational cells, he was transferred to Green Haven.[3] *Id.* ¶¶ 42–43. On September 27, 2011, at approximately 10:40 am, while still at Green Haven, Plaintiff complained of chest pains and was escorted to the facility infirmary. *Id.* ¶ 45. After Plaintiff had been examined, Defendants Kowalchuk, Rodriguez and Surprenant escorted him back to his cell. *Id.* ¶ 47. On the way back to the cell, Surprenant told Plaintiff that he was "full of shit," that he was "bullshitting and wasting his time," and that "this ain't Marcy [and] we have another way to treat mental illness and you're going to find out soon enough." *Id.* ¶¶ 48–50. Upon hearing this, Plaintiff requested that Surprenant allow him to see a mental health therapist. *Id.* ¶ 51. Defendant Rodriguez then interjected and said that "we got some therapy for you" and that "your [sic] going to need a physical therapist to teach you how to walk again." *Id.* ¶ 52.

Upon returning to his cell, Plaintiff was ordered to face the wall, which he did. *Id.* ¶ 53. Surprenant then instructed Plaintiff, who was still in restraints, to turn around and face him. *Id.* ¶ 54. After Plaintiff complied, Surprenant "got nose to nose" with him and stated, "you played games and wasted my time. I told you we have another way to treat mental illness." *Id.* ¶ 55. At that point, Rodriguez "[s]uddenly" punched Plaintiff in the left eye. *Id.* ¶ 56. Defendants Kowalchuk, Rodriguez and Surprenant then began beating Plaintiff "mercilessly with their hands and feet," and "punched and kicked [him] repeatedly about the body, face and head." *Id.* ¶¶ 57–58. Plaintiff alleges that upon information and belief, Defendant Rodriguez then "stepped on [his] lower back while Defendants Surprenant, Tillotson, Kowalchuk, Keran [sic], and Brothers held [him] down and removed the restraints." *Id.* ¶ 59. Defendants then left the cell and locked it behind them. *Id.* ¶ 61.

**\*2** Plaintiff alleges that he then informed Defendant Kowalchuk that he was in "excruciating pain and need[ed] medical attention," *id* . ¶ 60; however, Kowalchuk refused Plaintiff's request. *Id.* ¶ 62. Approximately one hour later, Defendant Miller, a nurse, arrived at Plaintiff's cell with a corrections officer to take photographs. *Id.* ¶ 63. At that point, Plaintiff's nose was bleeding profusely, he was bleeding out of his left eye, and he could barely stand up. *Id.* ¶ 64. Plaintiff informed Miller that he was in excruciating pain, but she did not "even [perform] a cursory examination ... [and] told Plaintiff that there was nothing wrong." *Id.* ¶¶ 64–65. Plaintiff alleges that Miller told him to "stop whining" and that crying is what babies do. *Id.* ¶ 66. She then exited the cell with the corrections officer. *Id.* ¶ 67.

Over the next two days, from September 27 to 29, 2011, Plaintiff alleges that he requested medical assistance for his injuries from Defendants Morlas, Patil, Panuto, Zwillinger, O'Conner, Brandow, Hannd, Sposato, Santoro, Edwards, Kutz, Kowalchuk, Lamay, and Gotsch, and that these Defendants all denied his requests. *Id.* ¶¶ 68–81. On the morning of September 29, 2011, a doctor came to Plaintiff's cell and, after examining him, determined that he was seriously injured and in need of immediate medical attention. *Id.* ¶ 82. Plaintiff was then transferred to an outside hospital, Westchester County Medical Center, where he was treated and later released. *Id.* ¶ 83. Plaintiff claims that he suffers from frequent migraines, "extreme debilitating back pain," loss of vision and a broken nose. *Id.* ¶ 84.

## II. Plaintiff has not Exhausted Administrative Remedies with Respect to his Eighth Amendment Deliberate Medical Indifference Claim

Plaintiff claims that Defendants violated his Eighth Amendment rights by using unnecessary and excessive force against him and by acting with "deliberate indifference or reckless disregard toward [his] serious medical needs by failing to take the steps necessary to ensure that [he] received treatment for his injuries." Am. Compl. ¶ 87. Defendants argue that Plaintiff's deliberate medical indifference claim should be dismissed because he failed to exhaust the administrative remedies available under DOCCS' three-tiered Inmate Grievance Program ("IGP"). Specifically, Defendants argue that Plaintiff's grievance only alleged that he was assaulted by several officers at Green Haven, and did not include any allegations that Defendants were deliberately indifferent to his medical needs.

### a. Prison Litigation Reform Act

The Prison Litigation Reform Act ("PLRA") "requires prisoners to exhaust prison grievance procedures before filing suit." *Jones v. Bock,* 549 U.S. 199, 202 (2007) (citations omitted). The PLRA's exhaustion requirement is "mandatory," *Porter v. Nussle,* 534 U.S. 516, 524 (2002), and " 'applies to all inmate suits about prison life.' " *Johnson v. Killian,* 680 F.3d 234, 238 (2d Cir.2012) (quoting *Porter,* 534 U.S. at 532). The Supreme Court has held that "the PLRA exhaustion requirement requires proper exhaustion." *Id.* (quoting *Woodford v. Ngo,* 548 U.S. 81, 93 (2007)) (internal quotation marks omitted). That is, "prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined

not by the PLRA, but by the prison grievance process itself." *Id.* (quoting *Jones,* 549 U.S. at 218).

**\*3** In New York, prisoners must exhaust each level of the three-tiered IGP. *Kasiem v. Switz,* 756 F.Supp.2d 570, 575 (S.D .N.Y.2010). Under the IGP, an inmate must: (i) file a complaint with the grievance clerk; (ii) appeal an adverse decision by the Inmate Grievance Resolution Committee ("IGRC") to the superintendent of the facility; and (iii) appeal an adverse decision by the superintendent to the Central Officer Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs. ("NYCRR") tit. 7, § 701.5. The IGP regulations provide that an inmate must submit a complaint on an inmate grievance complaint form, or on plain paper if the form is not readily available. 7 NYCRR § 701.5(a)(1). The regulations further require that "the grievance ... contain a concise, specific description of the problem and the action requested." 7 NYCRR § 701.5(a)(2).

Although failure to exhaust is "an absolute bar to an inmate's action in federal court," *George v. Morrison–Warden,* No. 06 Civ. 3188(SAS), 2007 WL 1686321, at \*2 (S.D.N.Y. June 11, 2007), the Second Circuit has recognized three grounds for exceptions to the exhaustion requirement. *See Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). First, a court must ask "whether administrative remedies were in fact 'available' to the prisoner." *Id.* (citation omitted). Second, a court must determine whether the defendant forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendant's own actions estop him from raising the affirmative defense of non-exhaustion. *Id.* Finally, if the court finds that administrative remedies were available to the plaintiff, and that the defendant is not estopped and has not forfeited his non-exhaustion defense, a court should consider whether any " 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Id.* (quoting *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004)).

### b. The Court May Consider Extrinsic Material Because Plaintiff was on Notice that Defendants' Motion to Dismiss Might be Converted to One for Summary Judgment and had the Opportunity to Submit Evidence Relevant to the Issue of Exhaustion

Defendants move to dismiss Plaintiff's deliberate indifference claim pursuant to Fed.R.Civ.P. 12(b)(6). Along with their moving papers, Defendants submit the declaration of Jeffery Hale, as well as a copy of the grievance Plaintiff filed at Marcy, numbered MCY–15928–12. *See* Doc. 68. On a Rule

12(b)(6) motion, a district court generally must confine itself to the four corners of the complaint and look only to the allegations contained therein. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir.2007). Accordingly, courts in this district have held that where non-exhaustion is clear from the face of a complaint, a court should dismiss the complaint under Rule 12(b)(6). *See Mateo v. Bristow*, No. 12 Civ. 5052(RJS), 2013 WL 3863865, at *3 (S.D.N.Y. July 16, 2013) (citing *Kasiem*, 756 F.Supp.2d at 575; *McCoy v. Goord*, 255 F.Supp.2d 233, 251 (S.D.N.Y.2003)). However, where non-exhaustion is not clear from the face of the complaint, courts should convert a Rule 12(b) motion into a Rule 56 motion for summary judgment "limited to the narrow issue of exhaustion and the relatively straightforward questions about ... whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused." *Id.* (quoting *McCoy*, 255 F.Supp.2d at 251). Before converting a Rule 12(b)(6) motion into a Rule 56 motion, courts must notify the parties and "afford [them] the opportunity to present supporting material." *Id.* (quoting *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir.2000)). Such notice and opportunity are "especially important when a plaintiff is *pro se.*" *Id.* (quoting *McCoy*, 255 F.Supp.2d at 251).

**\*4** Here, non-exhaustion is not clear from the face of Plaintiff's complaint. Accordingly, the Court must convert the current motion to one for summary judgment and look to extrinsic evidence. Before converting the motion, however, the Court must determine whether Plaintiff has been given "unequivocal notice" of his obligation to submit evidentiary materials and an opportunity to do so. *See McCoy*, 255 F.Supp.2d at 255.

The Court finds that Plaintiff has been given both notice and opportunity. First, Defendants moved to dismiss specifically on the ground of failure to exhaust and notified Plaintiff that the Court might choose to treat the motion to dismiss as one for summary judgment, and that to oppose it, he would need to submit evidence, such as affidavits. Doc. 67 (Notice to Pro Se Litigant); *see Kasiem*, 756 F.Supp.2d at 575 (holding that formal notice of conversion was not necessary where defendants attached as exhibits to their motion the records they had of plaintiff's grievances and appeals and notified plaintiff that the court might treat the motion to dismiss as one for summary judgment and that plaintiff must therefore submit evidence to oppose the motion); *see also McCoy*, 255 F.Supp.2d at 255–56 (holding that formal notice was not necessary where defendants moved to dismiss specifically on the ground of exhaustion and where plaintiff

directly addressed exhaustion in his opposition papers and referred the court to documentary evidence). Additionally, in his opposition papers, Plaintiff directly addresses the issue of exhaustion and refers the Court to documentary evidence, including a copy of Plaintiff's hospital records and "Special Watch Log Book # S1533," attached to his brief as exhibits. *See* Doc. 80. Accordingly, the Court finds that Plaintiff had "unequivocal notice" that the Court might convert Defendants' motion to dismiss to one for summary judgment and that Plaintiff had the opportunity to submit extrinsic materials pertinent to that issue.

### c. Plaintiff did not Exhaust Administrative Remedies with Respect to his Claim of Deliberate Indifference to his Medical Needs

Defendants argue that Plaintiff has not exhausted administrative remedies with respect to his claim of deliberate medical indifference because his grievance does not contain any allegations regarding Plaintiff's medical care; rather, Plaintiff's grievance only alleges that he was subjected to excessive force by several of the Defendants. Accordingly, Defendants argue that Plaintiff's grievance failed to " 'alert[ ] the prison to the nature of the wrong for which redress is sought,' " thereby failing to afford it "time and opportunity to address [his] complaints internally before allowing the initiation of a federal case." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir.2004) (quoting *Porter*, 534 U.S. at 524–25; *Strong v. David*, 297 F.3d 646, 650 (7th Cir.2002)).

The Second Circuit has held that "a claim may be exhausted when it is closely associated with, but not explicitly mentioned in, an exhausted grievance, as long as the claim was specifically addressed in the prison's denial of the grievance and, hence, was properly investigated." *Percinthe v. Julien*, No. 08 Civ. 893(SAS), 2009 WL 2223070, at *4, *4 n. 9 (S.D.N.Y. July 24, 2009) (citing *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir.2009) (holding that the plaintiff's claim for denial of medical care was exhausted by a grievance alleging excessive force and retaliation, explaining, "while Espinal's grievance ... does not explicitly discuss the misconduct by medical personnel which is alleged in the complaint, it is clear that the State considered these allegations when reviewing Espinal's grievance," because denial of medical care was addressed in the grievance's denial)). Ultimately, the question for the Court is "whether [the] plaintiff's grievance sufficiently alerted prison officials that he was alleging some wrongdoing beyond" that alleged against the individual or individuals specifically named in the grievance. *Id.*

**\*5** Here, Plaintiff's grievance merely alleges that he was subjected to excessive force by Defendants Surprenant, Rodriguez, Tillotson, Brothers, Krein, and Kowalchuk;[4] it does not allege that Defendants were deliberately indifferent to Plaintiff's medical needs. *See* Hale Decl., Ex. A. Indeed, the *only* reference in the grievance to Plaintiff's medical care is his allegation that on September 29, 2011, he was taken to Westchester Medical Center "for a cat scan for [his] left eye and a broken nose." *Id.* The Court also notes that Plaintiff's subsequent communications with prison officials regarding his grievance failed to mention any allegations of deliberate indifference to Plaintiff's medical needs. For example, in a December 26, 2011 letter to DOCCS' employee Teri Thomas, Plaintiff refers to his grievance as a "grievance of assault." *Id.* Similarly, in a January 14, 2012 letter to Karen Bellamy, Director of the IGP, regarding the status of his grievance, Plaintiff states that he "was assaulted in Green Haven Facility on 9/27/11" and makes no mention of Defendants' alleged denials of his requests for medical care. *Id.* Moreover, the Court's review of Plaintiff's grievance file indicates that the State did not investigate Plaintiff's allegation of deliberate indifference.[5] Indeed, the grievance file contains memoranda specifically regarding the alleged use of force by only those Defendants actually named in Plaintiff's grievance. Accordingly, the Court finds that Plaintiff's grievance did not "sufficiently alert[ ] prison officials that [Plaintiff] was alleging some wrongdoing beyond" the allegation that he was subjected to excessive force by Defendants Surprenant, Kowalchuk, Brothers, Krein, Tillotson, and Rodriguez.

Moreover, the Court finds that none of the three exceptions to the exhaustion requirement articulated by the Second Circuit in *Hemphill,* 380 F.3d at 686, are applicable to Plaintiff's case. First, administrative remedies were clearly "available" to Plaintiff, as he filed a grievance at Marcy on December 8, 2011, which was subsequently investigated by the Inspector General's Office. Hale Decl., Ex. A. Second, Defendants have not forfeited the affirmative defense of non-exhaustion, nor are they estopped from asserting it. Estoppel is found where "an inmate reasonably understands that pursuing a grievance through the administrative process will be futile or impossible." *Winston v. Woodward,* No. 05 Civ. 3385(RJS), 2008 WL 2263191, at *9 (S.D.N.Y. May 30, 2008) (citations omitted). As such, the Second Circuit has held that a plaintiff's non-exhaustion may be excused on the grounds of estoppel where the plaintiff was misled, threatened or otherwise deterred from fulfilling the requisite procedures. *Id.* (citing *Hemphill,* 380 F.3d at 688–89; *Ziemba v. Wezner,*

366 F.3d 161, 163–64 (2d Cir.2004)). Here, Plaintiff does not allege that Defendants improperly deterred him from filing a grievance regarding the alleged deliberate indifference, and the record does not evidence the existence of any such threats or misconduct on the part of Defendants.

**\*6** With respect to the third exception, the Second Circuit has held that "there are certain 'special circumstances,' " such as a reasonable misunderstanding of grievance procedures, "in which, though administrative remedies may have been available and though the government may not have been estopped from asserting the affirmative defense of non-exhaustion, the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." *Hemphill,* 380 F.3d at 689 (citations omitted). While Plaintiff does not specifically allege any "special circumstances" justifying his failure to exhaust administrative remedies, he states in his opposition papers that he "was told that his grievance was untimely" when he attempted to file it at Marcy, and that he believed he had "taken all the proper steps" by filing a complaint "with risk management at CNYPC [Central New York Psychiatric Center] for the excessive force claim and medical negligence." PL's Affirmation in Support of Motion (Doc. 78); *see also* PL's Mem. L. Opp. 6 (stating that Plaintiff filed a complaint concerning his "medical issues" with the risk management office at CNYPC on October 14, 2011). In light of its obligation to interpret Plaintiff's submissions as raising the strongest arguments that they suggest, *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006), the Court will treat Plaintiff's argument regarding his failure to exhaust administrative remedies as a request to excuse his non-exhaustion under the third *Hemphill* exception.

A review of the grievance file indicates that Plaintiff remained at Green Haven until October 13, 2011, where he was in a psychiatric observation cell in the Mental Health Unit and did not have access to any writing tools. Hale Deck, Ex. A. Plaintiff was then transferred to CNYPC, where he claims to have filed a complaint with "risk management." *Id.* After Plaintiff returned to Marcy on December 8, 2011, his grievance regarding the September 27, 2011 assault was rejected as untimely. *Id.* However, after prison officials confirmed that Plaintiff did not have access to the grievance process while at Green Haven and determined that he had shown "mitigating circumstances," Plaintiff's grievance was filed at Marcy on January 27, 2012. *Id.* Accordingly, the record indicates that despite initially being informed that his

grievance was untimely, Plaintiff was ultimately permitted to file his grievance upon his return to Marcy.

Moreover, to the extent that Plaintiff argues that his attempt to file a complaint while at CNYPC constitutes a "special circumstance" justifying his failure to exhaust administrative remedies, the Court disagrees. First, Plaintiff failed to provide the Court with a copy of the complaint that he allegedly filed at CNYPC, and the declaration of Jeffery Hale, Assistant Director of the IGP for DOCCS, states that after conducting a "diligent search for grievances and appeals filed by [Plaintiff] based on grievances filed at the facility level," Mr. Hale determined that Plaintiff "did not file a grievance alleging that defendants were deliberately indifferent to his medical needs while at Green Haven in September 2011." Hale Decl. ¶ 10. Plaintiff's unsupported allegation that he filed a grievance at CNYPC is insufficient to withstand a motion for summary judgment. *See Santiago v. Murphy,* No. 08 Civ.1961(SLT), 2010 WL 2680018, at *2–*3 (E.D.N.Y. June 30, 2010) (dismissing complaint where declarations submitted by defendant stated that there was "no record of any grievance" for the alleged incident and holding that plaintiff's unsupported allegation that he filed a grievance is insufficient to withstand a motion for summary judgment). Second, even assuming that Plaintiff did file a complaint with the risk management office at CNYPC, that complaint was clearly not exhausted. The IGP requires that inmates file grievances "with an IGP clerk." 7 NYCRR § 701.2(a); *see also id.* §§ 701.4(g), 701.5. Accordingly, Plaintiff's complaint to the risk management office was not properly filed. Additionally, Plaintiff does not assert that he appealed from the denial of that grievance, nor is there any record of such appeal. *Santiago,* 2010 WL 2680018, at *3. Finally, even if at the time of allegedly filing his complaint at CNYPC Plaintiff misunderstood the grievance procedure, his failure to exhaust administrative remedies would still not be justified. Upon his return to Marcy, Plaintiff clearly had an understanding of the grievance procedure sufficient enough to allow him to properly file a grievance regarding the excessive force allegation in accordance with the IGP. Plaintiff has provided the Court with no explanation to justify his failure to include in that grievance the allegation regarding Defendants' alleged deliberate indifference to his medical needs. Accordingly, as the record establishes that Plaintiff is aware of and has shown that he is capable of following the correct grievance procedure, the Court finds that he has failed to demonstrate the existence of "special circumstances" sufficient to excuse his non-exhaustion. [6] *See Kasiem,* 756 F.Supp.2d at 577–78 (holding that the plaintiff failed to demonstrate the existence

of "special circumstances" justifying his non-exhaustion where he had previously shown that he was capable of following the correct grievance procedure).

**\*7** The Court therefore finds that Plaintiff has failed to exhaust administrative remedies with respect to his deliberate medical indifference claim and that none of the three exceptions to the exhaustion requirement apply. Where a claim is dismissed for failure to exhaust administrative remedies, dismissal without prejudice is appropriate if the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Prisoners have 21 days from the date of the alleged occurrence to initiate the first formal step of the IGP, subject to exceptions "based on mitigating circumstances." 7 NYCRR §§ 701.5(a)(1), 701.6(g)(1)(i)(a). However, an exception to the time limit may not be granted if the request is made more than 45 days after the alleged occurrence. 7 NYCRR § 701.6(g)(1)(i)(a). Accordingly, because the time to both file a grievance and request an exception to the time limit has long expired, and because Plaintiff has not offered any reason for his delay in filing a grievance with respect to his deliberate indifference claim, the claim is dismissed with prejudice. [7] *See Santiago,* 2010 WL 2680018, at *3 (dismissing complaint with prejudice because "[a]ny grievance or appeal would now be untimely under 7 NYCRR § 701.5, and the time limit for seeking an exception to the time limitations under 7 NYCRR § 701.6 has also passed"); *see also Bridgeforth v. Bartlett,* 686 F.Supp.2d 238, 240 (W.D.N.Y.2010) (dismissing complaint with prejudice where the time limits for plaintiff to file an administrative appeal had long since passed and plaintiff did not allege "any facts excusing his failure to exhaust").

### d. Fischer and Lee are Dismissed as Defendants

Defendants move in the alternative to dismiss the Amended Complaint against Defendants Fischer and Lee. Plaintiff's sole allegation with respect to these Defendants relates exclusively to his deliberate medical indifference claim. *See* Am. Compl. ¶ 5. Accordingly, because the Court finds that Plaintiff has failed to exhaust administrative remedies with respect to his deliberate indifference claim, Defendants' motion to dismiss with respect to Defendants Fischer and Lee is granted.

Moreover, to the extent that Plaintiff seeks to hold Defendants Fischer and Lee liable for his excessive force claim, that claim is also dismissed against them. Case law is clear that supervisors may not be held vicariously liable for

their subordinates' violations. *See Rahman v. Fisher,* 607 F.Supp.2d 580, 584–85 (S.D.N.Y.2009). It is therefore "well settled" that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Id.* at 585 (citation omitted). Neither the factual allegations contained in the Amended Complaint nor the grievance file submitted by Defendants indicate that Defendants Fischer or Lee were "personally involved" in the alleged violation, either by directly participating in it or by failing to stop it. Although a review of Plaintiff's grievance file indicates that Defendant Lee received a memorandum from Defendant Surprenant regarding the alleged excessive use of force, case law is clear that "[a]fter the fact notice of a violation of an inmate's rights is insufficient to establish a supervisor's liability for the violation." *Id.*

## III. Conclusion

**\*8** For the reasons set forth above, Defendants' partial motion to dismiss is GRANTED. Accordingly, Plaintiff's First Cause of Action for Deliberate Indifference to an Inmate's Medical Needs in Violation of the Eighth and Fourteenth Amendments is DISMISSED with prejudice. [8] The only remaining claims are those for unnecessary and excessive use of force in violation of the Eighth Amendment; violations of the Americans with Disabilities Act; and violations of the Rehabilitation Act. The only remaining Defendants in this action are Surprenant, Tillitson, Brothers, Krein, Kowalchuk, and Rodriguez.

The Clerk of the Court is respectfully directed to terminate the motions. Docs. 65, 77. The parties are directed to appear for a status conference on October 2, 2013 at 9:30 am.

It is SO ORDERED.

**All Citations**

Slip Copy, 2013 WL 4774731

## Footnotes

1   On June 5, 2012, the Court dismissed DOCCS as a Defendant in this action. Doc. 6.

2   Plaintiff filed a Notice of Motion along with his opposition papers for an "Order pursuant to Rule 7(b) of the Federal Rule[s] of Civil Procedure granting a trial concerning the complaint." Doc. 77. As the motion is procedurally improper, the Court assumes that Plaintiff filed the Notice of Motion in further support of his opposition to Defendants' motion to dismiss, and will consider it accordingly.

3   The exact date on which Plaintiff was transferred to Green Haven is not clear from the face of the Amended Complaint.

4   The grievance mistakenly refers to Defendants Krein, Kowalchuk and Surprenant as "Keran," "Wallchuck" and "Suprintnay," respectively.

5   As Defendants mention in their motion papers, a September 27, 2011 memorandum from Defendant Surprenant to Defendant Lee regarding the incident states that "RN Miller reported to PSU to conduct the medical exam of inmate Hilbert in the cell. Swelling to his left eye and a small abrasion on the right arm was reported on the medical exam. All injuries were deemed minor in nature and the inmate remained in MH–OB–004 on the 1 to 1 watch." Hale Decl., Ex. A. Defendant Surprenant's reference to Plaintiff's medical examination and status immediately following the alleged excessive use of force does not suggest that the State investigated Plaintiff's claim of deliberate indifference. Moreover, Defendant Surprenant's description of Plaintiff's medical exam by Defendant Miller would not put the State on notice of any potential allegations regarding Defendants' alleged refusal of Plaintiff's requests for medical care. Additionally, Plaintiff's grievance file includes the medical report by Defendant Miller, dated September 27, 2011, describing the nature of Plaintiff's injuries. That report, however, also does not suggest that the State investigated or considered Plaintiff's claim of deliberate indifference; nor would the report have put the State on notice of such a claim.

6   The Court notes that the exhibits attached to Plaintiffs' opposition papers, which include a copy of Plaintiff's hospital records and "Special Watch Log Book # S1533," do not compel a different outcome, as they do not go to the issue of exhaustion.

7   The Supreme Court has held that the PLRA does not require dismissal of an entire complaint when a prisoner has failed to exhaust some, but not all, of the claims included in the complaint. *Jones,* 549 U.S. at 223–24. Accordingly, although the Court finds that Plaintiff's deliberate indifference claim should be dismissed for non-exhaustion, his remaining exhausted claims may proceed.

8   Although Defendants Santoro, Krein and Rodriguez did not join in Defendants' partial motion to dismiss, because the Court finds that Plaintiff failed to exhaust administrative remedies with respect to his deliberate medical indifference claim, that claim is dismissed as to those Defendants as well.

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2223070
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Smith PERCINTHE, Plaintiff,

v.

Paul E. JULIEN, Heather Almodoval,
Andrew W. Rheome, S. Grant, Defendants.

No. 08 Civ. 893(SAS).
|
July 24, 2009.

**Attorneys and Law Firms**

Smith Percinthe, Marcy, NY, pro se.

Jeb Harben, Assistant Attorney General, State of New York, Office of the Attorney General, New York, NY, for Defendants.

*OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

**I. INTRODUCTION**

 *1 Smith Percinthe, proceeding pro se, brings this action against four New York State Correction Officers pursuant to section 1983 of Title 42 of the United States Code ("section 1983"). Percmthe, seeking relief for the alleged use of excessive force and failure to protect in violation of the Eighth Amendment, alleges that Officer Paul Julien physically assaulted him while Officers James Almodoval, Andrew Rheome, and Steven Grant failed to intervene. Defendants Almodoval, Rheome, and Grant move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the following grounds: (1) they are entitled to qualified immunity, and (2) Percinthe did not exhaust administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). In addition, all defendants move to dismiss Percinthe's claims on the grounds of implausibility. For the reasons that follow, summary judgment is granted as to Almodoval, Rheome, and Grant, but denied as to Julien.

**II. BACKGROUND**

**A. Facts**

Percinthe was an inmate at Fishkill at the time of the alleged incident and is now an inmate at the Marcy Correctional Facility. [1] All parties agree that on February 28, 2007, at approximately 4:30 p.m., Officer Julien performed a pat frisk on Percinthe. [2] Percinthe alleges that in the midst of the search, Julien asked him whether he "liked looking at butt," and then punched Percinthe's face, mouth, and neck. [3] Percinthe alleges that Julien applied a chokehold, threw him into a desk, [4] and hit Percinthe's face while continuing the chokehold until Percinthe almost lost consciousness. [5] Before allowing Percinthe to return to his housing unit, Julien allegedly warned, "if you ever look at a butt or tell somebody what I did to you I will bust your ass." [6] Julien disagrees with Percinthe's version of the encounter, claiming that he simply pat frisked Percinthe and counseled him regarding inappropriate staring at female officers. [7]

Percinthe also claims that Officers Almodoval, Rheome, and Grant were present for most of the alleged assault. [8] Grant denies seeing Percinthe and Julien together during the incident, [9] while Amodoval and Rheome admit to seeing part of the pat frisk, but deny any impropriety on Julien's part. [10]

Percinthe, without pointing to admissible evidence beyond his own assertions, alleges that the incident caused him serious injury. In his Complaint, Percinthe claims that the attack resulted in

> [f]acial swelling, busted lip, front top left tooth cracked and loose, swelling to base of neck, both sides [of] neck tender upon palpation, anterior neck tender, spinal displacement to the point [that] I am in need of surgery, exacerbation of pain in right shoulder, constant headaches, increase of Para nasal sinus disease, paranoia, mental disturbance to the point that I am taking psyche [sic] medications [listing Zoloft, Visteraul, Loratadine, Naproxen, Methocarbamol, Ibuprofen, Accolate Zafirlukast, Amoxicillin Clavulanate, Acetaminophen, Clingdancyin, Triamcinolone nasal spray, and Methocarbamol]. [11]

**\*2** Percinthe further alleges that an x-ray "determined that I also had a right shoulder injury." [12]

Percinthe's visits to the prison's infirmary subsequent to the alleged attack substantiate "a little mark on his lower lip" and a "slightly loose tooth," as reported by Lorraine Grasso, the nurse who treated Percinthe on the day of the incident. [13] Her medical report of his visit [14] and photos taken that day corroborate her account. [15] A medical professional who examined Percinthe in October of 2007 determined, "I do not believe [Percinthe] has objective problems." [16]

### B. Administrative Grievance History

Percinthe reported the attack to Sergeant Beckwith on the day that it occurred and sent him a memorandum detailing the incident. [17] He did not mention Officers Almodoval, Rheome, and Grant in that memorandum, [18] but he claims that the day after the alleged attack, he informed Beckwith that there were three officers, in addition to Officer Julien, present during the incident. [19] Percinthe filed an official grievance on March 5, 2007, again with no mention of Almodoval, Rheome, or Grant. [20] In full, the grievance states,

> [At] approximately 4:30 pm February [sic] 28, 2007 I, Smith Percinthe [sic] was physically assaulted by Officer Julien the 3–11 shift officer; [sic] and threatened. I fear for my life. I don't know who will come after me next for the retaliation by Officer Julien. I want this officer to pay the price for what he has done. I request that no retaliation be imposed as was violated from my previous grievance. [21]

When the Inmate Grievance Program responded on March 12, 2007, Sergeant Beckwith had already interviewed and obtained statements from Almodoval and Rheome concerning their connection to the incident. [22] Almodoval and Rheome told Beckwith that they had witnessed at least part of the incident and—like Julien—described it as a "pat-frisk" and not an assault. [23]

The Inmate Grievance Program reported the incident to the Inspector General's office for investigation. [24] After the Inspector General, who questioned all parties to the suit under oath [25] (with the exception of Grant) found Percinthe's claims to be unsubstantiated, [26] Percinthe appealed to the Program's Central Office Review Committee. [27] The appeal was unanimously denied on April 11, 2007. [28]

### C. Procedural History

Percinthe filed the present Complaint against the Officers on January 25, 2008. Officers Julien, Rheome, and Grant moved to dismiss the suit in July of 2008, but their motion was denied. [29] In October of 2008, Percinthe filed an Amended Complaint to include defendant James Almodval, who was previously misidentified. [30]

## III. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [31] " 'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " [32] A fact is material when it " 'might affect the outcome of the suit under the governing law.' " [33] "It is the movant's burden to show that no genuine factual dispute exists." [34]

**\*3** In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. [35] "Rule 56 'mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " [36] To do so, the non-moving party must do more than show that there is " 'some metaphysical doubt as to the material facts,' " [37] and it " 'may not rely on conclusory allegations or unsubstantiated speculation.' " [38] Furthermore, a non-moving party may not "rely merely on denials or allegations in its own pleadings." [39] However, " 'all that is required [from the non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " [40] When relying on an affidavit, a party must set out facts that would be admissible at trial. [41]

In determining whether a genuine issue of material fact exists, the court must construe " 'the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in that party's favor.' " [42] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " [43] Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law." [44]

Where the plaintiff is proceeding pro se, his or her pleadings must be considered under a more lenient standard than that accorded to "formal pleadings drafted by lawyers," [45] and his or her pleadings must be "interpret[ed] ... to raise the strongest arguments they suggest." [46] However, a pro se plaintiff must still meet the usual requirements of summary judgment. [47] Thus, a pro se plaintiff's " 'failure to allege either specific facts or particular laws that have been violated renders [his or] her attempt to oppose defendants' motion [for summary judgment] ineffectual.' " [48]

## B. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions. [49] Failure to exhaust is an absolute bar to an inmate's action in federal court: "[section] 1997e(a) *requires* exhaustion of available administrative remedies *before* inmate-plaintiffs may bring their federal claims to court *at all.*" [50] Moreover, the exhaustion of administrative remedies must be proper —that is, in compliance with a prison grievance program's deadlines and other critical procedural rules—in order to suffice. [51] "[F]ailure to exhaust is an affirmative defense under the PLRA." [52] The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [53]

**\*4** " 'The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim,' because 'it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.' " [54] New York regulations provide that "[a] grievance should contain a concise, specific description of the problem and the action requested and indicate what actions the grievant has taken to resolve the complaint, i.e., specific persons/areas contacted and responses received." [55] The Second Circuit has found that these regulations, "[do] not contain an express identification requirement," and hence the grievance procedure may be exhausted against an individual without that person being named in a grievance. [56]

The Second Circuit has held that " '[a]lerting the prison officials as to the nature of the wrong for which redress is sought,' [without filing a formal grievance] does not constitute proper exhaustion." [57] "[N]otice alone is insufficient because ' [t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance .' " [58] However, the Second Circuit has held that a claim may be exhausted when it is closely associated with, but not explicitly mentioned in, an exhausted grievance, as long as the claim was specifically addressed in the prison's denial of the grievance and, hence, was properly investigated. [59] Ultimately, the question for this Court is "whether [the] plaintiff's grievance sufficiently alerted prison officials that he was alleging some wrongdoing beyond" that alleged against the person or persons specifically named in the grievance. [60]

## C. Qualified Immunity

Government officials performing discretionary functions are generally granted qualified immunity and are immune from suit provided that " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " [61] The Second Circuit has held that "[a] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." [62]

### 1. Failure to Protect

It is clearly established law that the Eighth Amendment not only prohibits excessive force, but also " 'requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody.' " [63] This includes a duty to protect inmates from harm threatened by other officers—"it

is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." [64]

"To prevail on a claim that officials have failed to protect an inmate from harm, a plaintiff must demonstrate that, objectively, the conditions of his incarceration posed a substantial risk of serious harm and, subjectively, that the defendant acted with deliberate indifference." [65] An official acts with deliberate indifference when he " 'has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.' " [66] "Liability will attach if the officer had a realistic opportunity to intervene to prevent the harm from occurring." [67] " 'Summary judgment based ... on qualified immunity requires that no disputes about material facts remain.' " [68]

### D. Implausibility

**\*5** While a court must not "weigh the credibility of the parties at the summary judgment stage," when "the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff ... without making some assessment of the plaintiff's account." [69] " '[W]hen the facts alleged are so contradictory that doubt is cast upon their plausibility, [the court may] pierce the veil of the complaint's factual allegations ... and dismiss the claim.' " [70] This analysis applies when " '[no] reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in [the] complaint.' " [71] However, " 'if there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete.' " [72]

### IV. DISCUSSION

The instant motion presents three issues: (1) whether Almodoval, Rheome, and Grant are entitled to qualified immunity, (2) whether Percinthe exhausted his administrative remedies as to Rheome, Grant, and Almodoval, and (3) whether Percinthe's claims against Julien, Almodoval, Rheome, and Grant are implausible.

### A. Almodoval, Rheome, and Grant Are Not Entitled to Qualified Immunity

Almodoval, Rheome, and Grant argue that they are entitled to qualified immunity because Percinthe has failed to allege that they had knowledge of the risk to Percinthe or a reasonable opportunity to intervene, thereby precluding liability. [73] However, Percinthe asserts, "[Julien] forced me inside of the ... area and told me to get on the wall and that's when I saw the three other officers on the right-hand corner by the door while this officer physically assaulted me," thereby alleging that the defendants witnessed at least part of the alleged attack. [74] The manner in which Percinthe describes the incident—consisting of multiple punches and an extended chokehold—would permit a rational trier of fact to reasonably conclude that the Officers had both knowledge of the attack and a reasonable opportunity to intervene. [75]

### B. Percinthe Has Not Exhausted Administrative Remedies Regarding His Failure to Protect Claim

Almodoval, Rheome, and Grant argue that Percinthe's claim against them has not been exhausted because Percinthe did not grieve their failure to protect him. [76] When I first considered this issue, I ruled that Percinthe met the relatively light burden associated with a motion to dismiss by alleging that he had informed Beckwith of the presence of other officers and that the prison had therefore questioned those officers. Percinthe thereby alleged that the prison was aware of his failure to protect claim and had fully investigated it. [77] However, a motion for summary judgment sets a higher bar for a complainant than a motion to dismiss. Percinthe fails to meet the summary judgment bar because he offers no evidence to support his allegation that he informed Beckwith of his failure to protect claim or his allegation that the prison actually investigated that claim.

**\*6** In his 56.1 Counterstatement, Percinthe states that he informed Beckwith that, "Almodoval, Rheome, and Grant stood by and refused to intervene." [78] However, Percinthe does not point to any evidence, including his own sworn testimony, to support this statement. Assuming, *arguendo*, that Percinthe informed Beckwith of the presence of Almodoval, Rheome, and Grant during the incident, Percinthe has failed to show that he alerted Beckwith to any wrongdoing on their part. The mere presence of witnesses does not necessarily implicate any wrongdoing on their part.

Furthermore, even if Percinthe verbally informed Beckwith of his failure to protect claim, verbal notice alone is insufficient to exhaust a claim. [79] Under the *Espinal* standard, the prison must have specifically investigated the claim, and Percinthe has offered no evidence in support of his allegation that the prison did so here. [80] While Almodoval and Rheome were questioned during the investigation of Percinthe's excessive force claim, there is no evidence to suggest that this investigation was anything other than a general inquiry into Julien's alleged wrongdoing. [81] In *Espinal,* the Second Circuit ruled that a claim that was not expressly included in a grievance was nonetheless fully grieved. In so ruling, the Second Circuit relied on the fact that the claim was specifically addressed in the prison's denial of the plaintiff's grievance and, hence, was investigated by the prison. [82] Here, the Superintendant's Decision regarding Percinthe's grievance falls far short of directly addressing a failure to protect claim. [83] The decision only responds to Percinthe's excessive force claim, stating that Julien "denies assaulting you or threatening you" and that Almodoval and Rheome "*deny the allegations in the grievance,* indicating that they observed Officer Julien perform a pat-frisk ... and that they did not observe any unprofessional conduct on *his* part." [84] Because Percinthe's succinct grievance refers only to his excessive force claim (and fails to mention that Officers were nearby during the alleged attack), Almodoval's and Rheome's denials relate exclusively to the excessive force claim. [85] In denying wrongdoing on Julien's part, neither Almodoval nor Rheome address any potential wrongdoing on their part. Accordingly, the prison's Grievance Response cannot be construed as directly addressing a failure to protect claim. The memoranda written by Almodoval and Rheome also exclusively focus on potential wrongdoing on Julien's part. [86] In sum, because the prison was not properly alerted to Percinthe's failure to protect claim, nor did the prison clearly investigate the claim, Percinthe has failed to exhaust administrative remedies with regard to that claim. Thus, defendants Almodoval, Rheome,

and Grant must be dismissed, without prejudice, based on Percinthe's failure to exhaust his administrative remedies.

## C. Percinthe's Claims Against Julien Are Plausible

**\*7** All of the defendants argue that Percinthe's claims should be dismissed for implausibility, noting that his injuries do not reflect the attack that he describes, that his description of the incident has changed over time, and that Julien could not possibly have restrained Percinthe. [87] However, Percinthe's allegations and testimony do not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds. Percinthe's testimony regarding his injuries is consistent, and the added details regarding the alleged attack—namely, that the chokehold lasted for five minutes and that while in the chokehold Percinthe hit a desk and then the floor—simply elaborate upon his earlier incomplete account of the incident. Furthermore, the fact that Percinthe is a physically strong man does not cast doubt upon his story; this would not be the first time that a large, muscular inmate was restrained by a Correction Officer.

## V. CONCLUSION

For the foregoing reasons, summary judgment is granted to defendants Almodoval, Rheome, and Grant, and denied as to defendant Julien. The Clerk of the Court is directed to close this motion (Docket # 34 and 46). The Pro Se Office is directed to send Mr. Percinthe the form necessary to request appointment of counsel. Percinthe is directed to complete this form and return it to this Court forthwith. A conference is scheduled for September 11, 2009 at 4:30 p.m.

SO ORDERED:

## All Citations

Not Reported in F.Supp.2d, 2009 WL 2223070

## Footnotes

1    *See* Plaintiff's Counterstatement Pursuant to Local Rule 56.1 ("Pl.Counter.56.1") ¶ 1; 2/19/09 Pro Se Memorandum, Change of Address.

2    *See* Plaintiff's Response to Defendants' Rule 56.1 Statement ¶ 3.

3    Pl. Counter. 56.1 ¶¶ 6, 8.

4    *See id.* ¶ 9.

5    *See* 11/26/08 Deposition of Smith Percinthe ("Percinthe Dep ."), Ex. K to 3/20/09 Declaration of Jeb Harben, defendants' counsel ("Harben Decl."), at 24–25.

6     Pl. Counter. 56.1 ¶ 10.

7     *See* Defendants' Statement of Facts Pursuant to Local Rule 56.1 ("Def.56.1") ¶ 3.

8     *See* Percinthe Dep. at 23.

9     *See* Def. 56.1 ¶ 5.

10    *See id.* ¶ 4. Inmate Billy Sigue also attested to witnessing part of the incident. *See* 10/12/07 Inspector General's Office Investigative Report ("Inspector General's Report"), Ex. E to Harben Decl. ("[Sigue] did witness Officer Julien choke and then take Inmate Percinthe to the floor.").

11    First Amended Complaint at 3.

12    Notice of Intention to File a Claim, Ex. E to 7/23/08 Memorandum of Law of Smith Percinthe ("Percinthe Mem."). Percinthe has not provided a medical report that substantiates the x-ray or supports Percinthe's conclusions about his shoulder injury.

13    3/26/07 Inspector General's Report of Interview of Lorraine Grasso, Ex. J to Harben Decl.

14    *See* 2/28/07 Inmate Injury Report Regarding Smith Percinthe, Ex. J to Harben Decl.

15    *See* 2/28/07 Photographs of Smith Percinthe, Ex. L to Harben Decl.

16    11/30/07 Report of Consultation Regarding Smith Percinthe, Ex. M to Harben Decl.

17    *See* 2/28/07 Memorandum of S. Percinthe to Sergeant Beckwith, Ex. D to Harben Decl.

18    *See id.*

19    *See* Pl. Counter. 56.1 ¶ 20.

20    *See* 3/5/07 Grievance of Smith Percinthe ("Grievance"), Ex. B to Harben Decl.

21    *Id.*

22    *See* 3/12/07 Inmate Grievance Program Superintendent's Decision Regarding Plaintiff's Grievance ("Grievance Resp."), Ex. C to Harben Decl. Beckwith denies conducting an investigation, but Almodoval's and Rheome's memoranda prove that they were included in the investigation, if not by Beckwith himself. *See* 2/28/07 Memorandum Prepared by Andrew Rheome ("Rheome Mem."), Ex. G to Harben Decl.; 2/28/07 Memorandum Prepared by Jimmy Almodoval ("Almodoval Mem."), Ex. H to Harben Decl. Grant was not asked to write a memorandum as he claimed that he did not witness the incident. *See* Def. 56.1 ¶ 5.

23    *See* Almodoval Mem.; Rheome Mem.

24    *See* Grievance Resp.

25    *See* 7/3/07 Transcript of Questioning of Paul Julien by the Inspector General's Office, Ex. F to Harben Deck; 7/3/07 Transcript of Questioning of Andrew Rheome ("Rheome Transcript"), Ex. G to Harben Deck; 7/3/07 Transcript of Questioning of Jimmy Almodoval ("Almodoval Transcript"), Ex. H to Harben Deck; Percinthe Dep.

26    *See* Inspector General's Report.

27    *See* 3/30/07 Receipt of Appeal, Ex. B to Percinthe Mem.

28    *See* 4/11/07 Denial of Appeal by CORC, Ex. B to Percinthe Mem.

29    *See Percinthe v. Julien,* No. 08 Civ. 893, 2008 WL 4489777 (S.D.N.Y. Oct. 4, 2008).

30    Almodoval filed his own motion for summary judgment shortly after the other defendants filed their motion, with arguments identical to those already presented to the Court. Because there is no prejudice to Percinthe, insofar as Almodoval's arguments are the same as those of his co-defendants, the Court addresses both motions for summary judgment.

31    Fed.R.Civ.P. 56(c)(2).

32    *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009) (quoting *Roe v. City of Waterbury,* 542 F.3d 31, 35 (2d Cir.2008)).

33    *Ricci v. DeStefano,* 530 F.3d 88, 109 (2d Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

34    *Vermont Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970)).

35    *See* Fed.R.Civ.P. 56(c)(2).

36    *Beard v. Banks,* 548 U.S. 521, 529 (2006) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).

37    *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007) (quoting *Matsushita Elec. Indus, v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).

38    *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

39    Fed.R.Civ.P. 56(e)(2).

40    *Kessler v. Westchester County Dep 't of Soc. Servs.,* 461 F .3d 199, 206 (2d Cir.2006) (quoting *Anderson,* 477 U.S. at 248–49).

41    See Fed.R.Civ.P. 56(e)(1).

42    *Mathirampuzha v. Potter,* 548 F.3d 70, 74 (2d Cir.2008) (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir.2005)).

43    *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997)). *Accord Anderson,* 477 U.S. at 249.

44    *Karpova v. Snow,* 497 F.3d 262, 270 (2d Cir.2007) (citing *Tocker v. Philip Morris Cos.,* 470 F.3d 481, 486–87 (2d Cir.2006)).

45    *Haines v. Kerner,* 404 U.S. 519, 520 (1972) (per curiam). *Accord Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) ("Because [plaintiff] is a pro se litigant, we read his supporting papers liberally.")).

46    *Burgos,* 14 F.3d at 790.

47    See *Pearson Educ, Inc. v. Liao,* No. 07 Civ. 2423, 2008 WL 2073491, at *2 (S.D.N.Y. May 13, 2008) (citing *Carey v. Crescenz,* 923 F.2d 18, 21 (2d Cir.1991)). *See also Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept. 8, 2004) (" 'Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment.' ") (quoting *Cole v. Artuz,* No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1998)).

48    *Mambru v. Inwood Cmty. Serv., Inc.,* No. 06 Civ. 2155, 2007 WL 4048007, at*2 (quoting *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994)).

49    See 42 U.S.C. § 1997e(a) (providing that "No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") ("section 1997"). *See also Jones v. Bock,* 549 U.S. 199, 202 (2007).

50    *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (quotation marks and citation omitted, emphasis in original).

51    See *Woodford v. Ngo,* 548 U.S. 81, 90–92 (2006).

52    *Jones,* 549 U.S. at 216.

53    *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

54    *Espinal v. Goord,* 558 F.3d 119, 124 (2d Cir.2009) (quoting *Jones,* 549 U.S. at 218).

55    7 New York Code, Rules and Regulations ("N.Y.C.R.R.") § 701.5(a)(2).

56    *Espinal,* 558 F.3d at 126.

57    *Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005) and citing *Woodford,* 548 U.S. at 94–95) (finding plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to the MDC's staff).

58    *Id.* (quoting *Woodford,* 548 U.S. at 95). *Accord Jones,* 549 U.S. at 204 ("Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court.").

59    See *Espinal,* 558 F.3d at 128 (holding that the plaintiff's claim for denial of medical care was exhausted by a grievance alleging excessive force and retaliation, explaining, "while Espinal's grievance ... does not explicitly discuss the misconduct by medical personnel which is alleged in the complaint, it is clear that the State considered these allegations when reviewing Espinal's grievance," because denial of medical care was addressed in the grievance's denial).

60    *Turner v. Goord,* 376 F.Supp.2d 321, 325 (W.D.N.Y.2005) (citing *Ortiz v. McBride,* 380 F.3d 649, 653–54 (2d Cir.2004)).

61    *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004) (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)).

62    *Id.* (quotation marks and citation omitted).

63    *Beckles v. Bennett,* No. 05 Civ.2000, 2008 WL 821827, at *17 (S.D.N.Y. Mar. 26, 2008) (quoting *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996)).

64    *Mack v. Town of Wallkill,* 253 F.Supp.2d 552, 559 (S.D.N.Y.2003) (citing *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988)).

65    *Id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 833 (1994)).

66    *Id.* (quoting *Lee v. Artuz,* No. 96 Civ. 8604, 2000 WL 231083, at *5 (S.D.N.Y. Feb. 29, 2000) (quoting *Hayes,* 84 F.3d at 620).

67    *Id.* (citing *O'Neill,* 839 F.2d at 11–12).

68 *Rivera v. Lawrence,* No. 09 Civ. 0967, 2009 WL 1734735, at *7 (N.D.N.Y. June 18, 2009) (quoting *Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998)).

69 *Jeffreys,* 426 F.3d at 554.

70 *Id.* at 555 (quoting *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 470 (S.D.N.Y.1998)).

71 *Id.* (quoting *Schmidt v. Tremmel,* No. 93 Civ. 8588, 1995 WL 6250, at *10–*11 (S.D.N.Y. Jan. 6, 1995)).

72 *Id.* (quoting *Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112 (2d Cir.1998)).

73 *See* Def. Mem. at 8; Almodoval Mem. at 7.

74 Percinthe Dep. at 23.

75 *See id.* at 23–27.

76 *See* Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def.Mem.") at 2; Memorandum of Law in Support of Defendant Jimmy Almodoval's Motion for Summary Judgment ("Almodoval Summary Judgment Mem.") at 2.

77 *See Percinthe,* 2008 WL 4489777, at *4. While Almodoval was not yet joined as a defendant when this ruling was issued, the identical analysis applies to him.

78 *See* Pl. Counter. 56.1 ¶ 20.

79 *See Macias,* 495 F.3d at 44 (where informally complaining to prison staff did not exhaust a claim).

80 *See* 6/5/09 Plaintiff's Memorandum of Law in Opposition to Defendant's [sic] Motion for Summary Judgment at 8.

81 *See* Almodoval Mem.; Rheome Mem.; Almodoval Transcript.; Rheome Transcript.

82 *See Espinal,* 558 F.3d at 128.

83 *See* Grievance Resp.

84 *Id.* (emphasis added).

85 *See* Grievance.

86 The transcripts of Ortiz's questioning of Almodoval and Rheome are inconclusive. Inspector Ortiz's questions focus on Julien's alleged offense, but because neither Officer admits to seeing Julien exercise excessive force, there was no cause for Ortiz to question their alleged failure to protect. *See* Almodoval Transcript; Rheome Transcript.

87 *See* Def. Mem. at 10; Almodoval's Mem. at 9–10.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.